Filed 9/9/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Colusa)

----

| | |
|---|---|
| ELAINE ROMINGER et al., | C073815 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV23899) |
| v. | |
| COUNTY OF COLUSA et al. | |
| Defendants and Respondents; | |
| ADAMS GROUP INC., | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Colusa County, Jeffrey A. Thompson, Judge. Affirmed in part and reversed in part.

Kronick, Moskovitz, Tiedemann & Girard, Jonathan P. Hobbs, Mona G. Ebrahimi and Leslie Z. Walker, for Plaintiffs and Appellants.

1

Stoel Rives, Timothy M. Taylor, Kristen T. Castanos, Juliet H. Cho for Defendants, Respondents and Real Party in Interest.

In this mandamus action under the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.), plaintiffs Elaine and Gerald Rominger challenged a mitigated negative declaration approved by defendant Colusa County with respect to a subdivision proposed by real party in interest Adams Group Inc. The trial court denied the Romingers' petition based on the conclusion that, notwithstanding the county's approval of a mitigated negative declaration, the county's "action in approving the subdivision map was not a project for CEQA purposes and [thus] no review beyond the preliminary review stage was required."

On the Romingers' appeal, we conclude the trial court erred in determining the proposed subdivision was not a CEQA project, even though the proposal did not include any specific plans for development. On our independent review of the Romingers' other complaints, however, we find merit in only one. Specifically, we conclude that the Romingers adequately showed there is substantial evidence in the record that the subdivision may have a significant unmitigated impact on traffic at a particular intersection adjacent to the project site. Accordingly, on that basis only, we will reverse and remand for the preparation of an environmental impact report (EIR).

FACTUAL AND PROCEDURAL BACKGROUND

The present action pertains to four adjacent parcels in Colusa County consisting of a total of just over 159 acres that are bordered by County Line Road to the south, Grevie Road to the east, the Southern Pacific Railroad right-of-way to the west, and agricultural

---

[1] All further section references are to the Public Resources Code unless otherwise noted. We will refer to the CEQA statutes in the format CEQA section ____ or (CEQA, § ____).

land to the north.  (We will refer to the four parcels jointly as the Adams property or the project site.)  County Line Road intersects Interstate 5 just to the west of the property.

In 2001, the county approved an amendment to its general plan changing the general plan land use designation for the Adams property from agricultural-industrial to industrial and to its zoning ordinance changing the zoning designation from exclusive agriculture to industrial.  In connection with that action, the county certified a mitigated negative declaration.  Gerald Rominger challenged the county's action under CEQA, and the parties eventually settled that lawsuit while it was on appeal, with the county agreeing to prepare, circulate, and adopt a revised initial study/mitigated negative declaration incorporating supplemental mitigation.

On May 26, 2009, real party in interest Adams Group Inc. filed an application for approval of a tentative subdivision map to divide the four existing parcels into 16 parcels ranging in size from 1.19 acres to 30.80 acres "for future expansion where separate financing may be needed."[2]  At the time of the application, 93 acres were in agricultural production with the remaining 66 acres of the site occupied by agricultural related light industrial uses and ancillary undeveloped land, including a 11.44-acre detention pond at the northeast corner of the site.  The existing agricultural related light industrial operations were accessed by a paved road extending into the site from Grevie Road.

The subdivision application indicated that no specific plan for future expansion was then available and that the intention was to continue the existing use of the property at that time.  An attachment to the application described the property as "currently devoted [to] agriculture related industry," with "a portion of said property devoted to

---

[2]     The application identified the owner of the property as "William & Janice Adams Group, Inc."  This is presumably the same entity as the real party in interest identified in the pleadings in this case:  Adams Group Inc.

agriculture production," and the surrounding properties as "devoted to agriculture production with one homesite and shop to the north and Interstate 5 to the west."

In January 2010, the county hired a consultant to prepare an initial study. The initial study was completed in June 2010 and recommended proceeding by way of a mitigated negative declaration. The study determined that the project would potentially have a significant environmental impact on cultural resources, but that impact could be mitigated to less than significant through mitigation measures.

In July 2010, the county noticed a public hearing for September 13 regarding adoption of the mitigated negative declaration, following a public comment period from July 12 to August 11. During the public comment period, the Romingers submitted comments requesting that the county proceed by way of an EIR rather than a mitigated negative declaration. The Romingers contended the mitigated negative declaration was "legally deficient in a number of areas, including an inadequate project description, a failure to recognize conflicts with the County's General Plan, and a failure to properly analyze and mitigate for impacts to areas such as agricultural resources, traffic, odor, noise, and water supply." Among other things, the Romingers complained that "no future use [wa]s analyzed" and "even if the exact use is yet to be determined, the County must analyze the potential impacts of the operations based on the most reasonable significant impacts. [Citation.] Since the types of permissible uses in the Industrial zoning designation have been specified in the County's Municipal Code, it is both reasonable and feasible for the County to analyze environmental impacts from these activities." The Romingers further argued that the county's "fail[ure] to consider the environmental effect of the foreseeable future industrial use and development" would result in the improper " 'piece-meal[ing]' " of the project.

As a result of the Romingers' comments, the county determined that a water supply assessment was needed. Accordingly, the county cancelled the public hearing on the original mitigated negative declaration. Thereafter, in September 2010, the

4

Romingers submitted additional comments on the proposed mitigated negative declaration, asserting that it "failed to adequately analyze air quality, odors, greenhouse gas emissions, and noise."

A revised initial study was completed by August 2011. Like the original study, the revised initial study recommended proceeding by way of a mitigated negative declaration. The study determined that the project would potentially have significant environmental impacts on air quality, cultural resources, and hydrology/water quality, but those impacts could be mitigated to less than significant through mitigation measures.

On August 1, 2011, the county noticed a public hearing before the planning commission on the proposed revised mitigated negative declaration for "September 12, 2011, at 9:00 a.m. in the Board of Supervisors Chambers in the Historic Courthouse, located at 547 Market Street, Colusa." The notice stated that the public comment period would be "from August 7, 2011 to September 5, 2011 at 5:00 p.m."

As later explained in an agenda report for the board of supervisors, the revised initial study and mitigated negative declaration "evaluate[d] the impacts of potential development that m[ight] be triggered by the subdivision[], including development to facilitate access to and drainage for the newly created parcels, and potential future development of a reasonable development scenario." The report took the position that because "[t]he future development scenario [wa]s presented for analysis only, and [wa]s not currently proposed," "the analysis . . . completed by the County . . . actually [wa]s not required by CEQA." The report further explained as follows: "Based upon available building permit evidence, grading permit record, and visual evidence along the I-5 corridor, it is reasonable to expect that agriculture-related industries will develop on the project site. This projection is based on: a) existing industrial development on the project site is agriculturally related; [and] b) County Planning staff performed a records search, zoning map review, and field survey of properties along the 1-5 corridor, and found that development on industrially zoned properties consists of agriculture-related

5

industries. Although a range of non-agriculture industrial uses are permitted in the M zone, the establishment of these uses is considered unlikely due to the geographical location of Colusa County, the building permit history and pattern, the location of natural resources, and market locations. For each of these reasons, a reasonable future development scenario that assumes agriculturally-related industrial development is analyzed in the County's [mitigated negative declaration]."

During the public comment period, the Romingers submitted a letter that reiterated the concerns they had previously expressed, asserted defects in the notices of the public hearing and in the close of public comment period, and also detailed additional complaints about the proposed mitigated negative declaration.

Notwithstanding the Romingers' complaints, the planning commission voted to approve the revised mitigated negative declaration for the project. The Romingers appealed that determination to the board of supervisors. The board of supervisors heard the Romingers' appeal in February 2012. The board denied the appeal and in March 2012 adopted a resolution approving the project and the revised mitigated negative declaration.

In April 2012, the Romingers commenced the present action by filing a petition for writ of mandate asserting that the county had violated CEQA by "failing to prepare an [EIR] for the Project, preparing a deficient mitigated negative declaration . . . for the Project, adopting insufficient mitigation measures, providing inadequate public review of the [mitigated negative declaration], and approving the Project on the basis of findings that are not supported by substantial evidence." In response, the county and the real party in interest argued (among other things) that the county "actually exceeded the requirements of CEQA by preparing a [mitigated negative declaration] for a Project that has no potential to result in any physical change in the environment."

The trial court determined that even though the county had treated the activity as a project for purposes of CEQA by preparing a mitigated negative declaration, that did not

6

preclude the court from determining that the project was *not* a project for purposes of CEQA. The court then proceeded to make that determination, as follows:

"Here, the same tract was previously the subject of a general plan revision and rezoning. At the time those actions were taken the [Romingers] brought legal action under CEQA to challenge the agency process. That prior dispute resolved by formal agreement between the parties after which time the current zoning and general plan provisions were put in place.

"Now, [the Romingers] challenge the partition of that same property on the basis that the partition will negatively impact the environment by rendering more likely the ultimate development of the tract in question. The record provides no substantial evidentiary support for such a conclusion. [The Romingers'] position that reduced parcel size will lead to accelerated development and development of a more intensive character is sheer speculation. One could as easily posit that a larger industrial tract would be more attractive to development since industrial complexes often require substantial acreage to accommodate their purposes.

"Accordingly, this court finds that County's action in approving the subdivision map was not a project for CEQA purposes and that no review beyond the preliminary review stage was required."

From the resulting judgment denying their mandamus petition in March 2013, the Romingers timely appealed.

DISCUSSION

I

*The County Is Not Barred From Asserting That The Adams Subdivision*

*Is Not A CEQA Project Or Is Subject To The Common Sense Exemption From CEQA*

The Romingers argue that because the county treated the Adams subdivision as a CEQA project at the administrative level -- approving a mitigated negative declaration that identified potential environmental impacts -- the county should be "barred" from

7

asserting in court that the subdivision is not a CEQA project or is subject to the common sense exemption from CEQA. We disagree because the Romingers' argument is based on a false premise.

Although the county, in approving a mitigated negative declaration for the subdivision, acted *under* the provisions of CEQA, the county always took the position that what it was doing was *not required by* CEQA. Specifically, the board of supervisors found that "[t]he environmental analysis was conducted to provide public information about impacts that could occur if a reasonable development scenario were to be pursued," but "[t]he analysis is informational and not required pursuant to CEQA or local statute." Thus, it was the county's position that it was *gratuitously* conducting a CEQA analysis of the subdivision when the law did not actually require it, because the subdivision either did not qualify as a CEQA project or was subject to the common sense exemption from CEQA. When the county's arguments are viewed in this light, it can be seen that the county is not arguing that what it did at the administrative level was *wrong*, just that it was *not legally required* by CEQA.[3]

The Romingers have offered us no persuasive reason why the county should be barred from asserting that the environmental review it conducted was more than what was legally mandated. In fact, if the county were correct on this point, it would serve no purpose for the courts to spend valuable time and resources reviewing whether a purely *voluntary* environmental review complied with legal provisions that did not actually mandate that review. The task of the courts under CEQA is " 'to review the agency's actions to determine whether the agency complied with procedures *required by law*.' " (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 113, italics added.) The

---

[3]     On appeal, the county and the real party in interest are represented by the same attorneys and filed a joint brief; thus, when we refer to the county's arguments on appeal, we are also referring to the arguments of the real party in interest.

8

county's argument here is that its actions complied with procedures required by law because the law required *no* procedures, and thus everything the county did went "above and beyond the requirements of law." We conclude the county is not barred from making this argument. Thus, notwithstanding its preparation of a mitigated negative declaration, the county is entitled to argue before this court that the Adams subdivision either did not qualify as a CEQA project or was subject to the common sense exemption from CEQA. As will be seen, however, those arguments are to no avail.

II

*The Adams Subdivision Qualifies As A CEQA Project*

"CEQA and its implementing administrative regulations . . . establish a three-tier process to ensure that public agencies inform their decisions with environmental considerations. [Citation.] The first tier is jurisdictional, requiring that an agency conduct a preliminary review to determine whether an activity is subject to CEQA. [Citations.] An activity that is not a 'project' as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 379-380, fn. omitted (*Muzzy Ranch*).)

"Whether an activity constitutes a project subject to CEQA is a categorical question respecting whether the activity is of a general kind with which CEQA is concerned, without regard to whether the activity will actually have environmental impact. Thus, for CEQA's purposes, ' "[p]roject" means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other

9

entitlement for use by one or more public agencies.' [Citation.] Whether an activity is a project is an issue of law that can be decided on undisputed data in the record on appeal." (*Muzzy Ranch*, *supra*, 41 Cal.4th at pp. 381-382.)

Here, the Romingers contend the trial court erred in finding the Adams subdivision was not a CEQA project. In a CEQA case, however, "we review the agency's action, not the trial court's decision." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381.) Thus, the question for us is not whether the trial court erred, but rather whether the subdivision qualifies as a CEQA project as a matter of law, such that the county's environmental review of the subdivision was *mandatory* under CEQA, rather than voluntary as the county asserts. We conclude the subdivision does qualify as a CEQA project.

The Romingers contend the Adams subdivision qualifies as a CEQA project because section 21080 specifically provides that CEQA applies to "the approval of tentative subdivision maps." We agree.

Subdivision (a) of section 21080 provides that "[e]xcept as otherwise provided in [CEQA], [CEQA] shall apply to discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits, and *the approval of tentative subdivision maps* unless the project is exempt from this division." (Italics added.) According to the Romingers, this statute makes the approval of a tentative subdivision map a CEQA project *categorically*. The county responds that "[t]his ignores the facts and elevates form over substance" because "[a]ll subdivisions are not born alike," and "[t]he fact remains that the [Adams] Subdivision . . . will not directly or indirectly result in significant impacts to the environment."

The answer to the county's response largely lies in the Supreme Court's recognition in *Muzzy Ranch* that "[w]hether an activity constitutes a project subject to CEQA is a *categorical* question respecting whether the activity is of a *general* kind with

which CEQA is concerned, without regard to whether the activity will actually have environmental impact." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381, italics added.) In essence, by enacting subdivision (a) of section 21080 the Legislature has determined that certain activities, including the approval of tentative subdivision maps, *always* have at least the *potential* to cause a direct physical change or a reasonably foreseeable indirect physical change in the environment. This makes sense. It virtually goes without saying that the purpose of subdividing property is to facilitate its use and development. (See Gov. Code, § 66424 [defining "subdivision" for purposes of the Subdivision Map Act as "the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, *for the purpose of sale, lease, or financing*, whether immediate or future," italics added].) Presumably no one goes to the trouble of subdividing property just for the sake of the process; the goal of subdividing property is to make that property more useable. And with the potential for greater or different use comes the potential for environmental impacts from that use. Thus, the Romingers are correct that under subdivision (a) of section 21080, the approval of a tentative subdivision map is categorically a CEQA project.

This conclusion is supported by our Supreme Court's analysis in *Muzzy Ranch*. There, the court determined that the adoption of a land use compatibility plan for the area around Travis Air Force Base qualified as a CEQA project because it was "the sort of activity that may cause a direct physical change or a reasonably foreseeable indirect physical change in the environment." (*Muzzy Ranch*, *supra*, 41 Cal.4th at pp. 378, 382.) Specifically, the court found that "by freezing residential densities in Compatibility Zone C," the plan might "have the consequence, notwithstanding existing zoning or land use planning, of displacing development to other areas of the jurisdiction." (*Id.* at pp. 382, 383.) The court then determined, however, that the adoption of the plan was nonetheless exempt from CEQA under the common sense exemption (which we will discuss further

11

hereafter) because the plan "simply incorporate[d] existing general plan and zoning law restrictions on residential housing density" and thus "any potential displacement the [plan] might otherwise have effected already ha[d] been caused by the existing land use policies and zoning regulations." (*Id.* at p. 389.) Accordingly, while the adoption of the plan qualified as a CEQA project because it was the *type* of activity that might cause a physical change to the environment in that it might cause displacement of residential development to other areas, the adoption of the plan was exempt from CEQA because *in fact* any such displacement would not be caused by the plan but instead by the existing land use policies and zoning regulations the plan incorporated.

Our Supreme Court's conclusion in *Muzzy Ranch* that an activity can qualify as a CEQA project because it is of the *sort* that *may* cause environmental effects but can, in turn, be exempt from CEQA because, *in fact*, it *will not* cause any such effects supports our conclusion here that whether the approval of the Adams subdivision qualifies as a CEQA project must be determined by looking at the activity *categorically*. Because the Legislature has determined in section 21080 that the approval of a tentative subdivision map is the sort of activity that may cause physical changes to the environment, the Adams subdivision qualifies as a CEQA project.

## III

### *The Common Sense Exemption Does Not Apply*

"The second tier [of the CEQA process] concerns exemptions from CEQA review. The Legislature has provided that certain projects, such as ministerial projects and repairs to public service facilities of an emergency nature, are exempt. [Citations.] In addition, pursuant to the Legislature's command [citation], the CEQA Guidelines list categorical exemptions or 'classes of projects' that the resources agency has determined to be exempt per se because they do not have a significant effect on the environment.

"A project that qualifies for neither a statutory nor a categorical exemption may nonetheless be found exempt under what is sometimes called the 'commonsense'

12

exemption, which applies '[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment' " (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380.) "[W]hether a particular activity qualifies for the commonsense exemption presents an issue of fact, and that the agency invoking the exemption has the burden of demonstrating it applies. [Citation.] An agency's duty to provide such factual support 'is all the more important where the record shows, as it does here, that opponents of the project have raised arguments regarding possible significant environmental impacts.' " (*Id.* at p. 386.)

Here, the county contends the Adams subdivision is exempt from CEQA under the common sense exemption because it is "a map approval that merely establishes new parcel lines" and therefore there is an "absence of any possible effect on the environment." We disagree.

In applying for approval of the tentative subdivision map, the Adams Group stated that its objective was to "[d]ivide [the] existing parcels into 16 separate parcels for future expansion where separate financing may be needed." Thereafter, in response to comments by the Romingers, the county itself explained that "[t]he purpose of the project is to separate the existing uses on the project site *and create lots for lease or sale*." (Italics added.) Thus, the record establishes that the purpose of the subdivision was to make the property more amenable to development by creating smaller parcels on which it would be easier to obtain financing than the existing, larger parcels.

For the common sense exemption to apply, the county would have to show as a factual matter, based on the evidence in the record, that there is no possibility that the approval of the Adams subdivision may result in a significant effect on the environment, i.e., that despite the subdivision of the property into smaller parcels to facilitate lease or sale, there is no possibility that purpose will be achieved and the creation of the smaller parcels *will not* lead to the development of those parcels and to resulting significant environmental effects. The county did not make that showing. On the record before us,

13

it remains an eminently reasonable possibility that the creation of smaller parcels that are easier to finance *will* lead to development that might not otherwise occur, and to attendant significant effects on the environment. Thus, the common sense exemption does not apply.

IV

*The County Abused Its Discretion In Failing To Provide*

*A Full 30-Day Public Review Period For The Mitigated Negative*

*Declaration, But No Prejudice Has Been Shown*

The Romingers contend the county failed to provide the mandatory 30-day public review period for the mitigated negative declaration and this failure constituted a prejudicial abuse of discretion. We agree the county failed to comply with CEQA in this regard, but we also conclude that no prejudice from the noncompliance has been shown and therefore the noncompliance provides no basis for overturning the county's decision.

"The public review period for a proposed negative declaration or proposed mitigated negative declaration may not be less than 20 days. If the proposed negative declaration or proposed mitigated negative declaration is submitted to the State Clearinghouse for review, the review period shall be at least 30 days . . . ." (CEQA, § 21091, subd. (b).) The Romingers assert that, pursuant to this provision, the public review period required here was 30 days, and the county does not disagree.

"A notice of intent to adopt a negative declaration or mitigated negative declaration shall specify . . . [¶] . . . [¶] (2) [t]he starting and ending dates for the review period during which the lead agency will receive comments on the proposed negative declaration or mitigated negative declaration. This shall include starting and ending dates for the review period." (Guidelines, § 15072, subd. (g).)[4]

---

[4] Hereafter, we will refer to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) in the format Guidelines section ____ or (Guidelines, § ____).

On August 1, 2011, the county issued a notice of public hearing and intent to adopt a mitigated negative declaration for the Adams subdivision that stated the public comment period would be "from August 7, 2011 to September 5, 2011 at 5:00 p.m." The notice was posted on a bulletin board at the Colusa County Courthouse on August 5 and published in the local newspaper on August 6. On August 4, the county issued a public notice of availability/notice of intent identifying the same public comment period. That notice was mailed to various interested parties on August 5.

The Romingers complain that the public review period the county specified in its notices was only 29 days long, not the 30 days required by CEQA, because the last day of the period -- September 5, 2011 -- was the Labor Day holiday, and under section 12 of the Code of Civil Procedure that day is excluded.[5] The Romingers rely on *Latinos Unidos de Napa v. City of Napa* (2011) 196 Cal.App.4th 1154 to support the proposition that Code of Civil Procedure section 12 applies to the calculation of the public review period. The Romingers further argue that the review period was "effectively truncated . . . three additional days" because of the three-day Labor Day weekend, during which the county offices were closed.

The county questions the authority for applying section 12 of the Code of Civil Procedure here and contends that notwithstanding the public review period specified in its notices of intent -- August 7 to September 5 -- it complied with CEQA because "both notices indicating the [mitigated negative declaration] was available for review were published more than 30 days before the identified close of the comment period on September 5, 2011" and "the public review remained open through the close of the Planning Commission hearing on September 12, 2011."

---

[5]     "The time in which any act provided by law is to be done is computed by excluding the first day, and including the last, unless the last day is a holiday, and then it is also excluded." (Code Civ. Proc., § 12.)

15

We begin with the question of whether Code of Civil Procedure section 12 governs the calculation of the required 30-day public review period. As noted, the Romingers rely on *Latinos Unidos* to support their affirmative answer to that question. We find *Latinos Unidos* distinguishable.

*Latinos Unidos* involved the CEQA requirement that "[a] notice of determination [NOD] filed with the county clerk shall be available for public inspection and shall be posted within 24 hours of receipt for a period of at least 30 days." (Guidelines, § 15094, subd. (e).) In that case there was "substantial evidence that the NOD . . . was posted over the course of 31 consecutive days, from 10:00 a.m. on June 17, 2009, until at least 10:00 a.m. on July 17, 2009." (*Latinos Unidos de Napa v. City of Napa*, *supra*, 196 Cal.App.4th at p. 1160.) The plaintiff contended that period was insufficient to comply with the 30-day requirement because the period of posting should be calculated pursuant to Code of Civil Procedure section 12. (*Latinos Unidos*, at p. 1160.) The appellate court agreed, noting that "Code of Civil Procedure section 12 sets forth 'the ordinary rule of computation of time' " and that " '[a]bsent a compelling reason for a departure, this rule [(Code Civ. Proc., § 12)] governs the calculation of *all* statutorily prescribed time periods.' " (*Latinos Unidos*, at p. 1161.)

It is true the statutory command at issue here ("the review period shall be at least 30 days" (CEQA, § 21091, subd. (b))) is similar to the command of the Guidelines at issue in *Latinos Unidos* ("[a] notice of determination . . . shall be posted . . . for a period of at least 30 days"). (Guidelines, § 15094, subd. (e).) There is a critical difference between the two situations however. That difference is that here, with respect to the public review period, the Guidelines specifically provide that "[a] notice of intent to adopt a negative declaration or mitigated negative declaration shall specify . . . [¶] . . . [¶] (2) [t]he starting and ending dates for the review period during which the lead agency will receive comments on the proposed negative declaration or mitigated negative declaration. This shall include starting and ending dates for the review period."

16

(Guidelines, § 15072, subd. (g).)  This provision essentially serves the same purpose that Code of Civil Procedure section 12 would otherwise serve, which is to provide certainty, "so that the method of computing time not be a source of doubt or confusion."  (*In re Anthony B.* (2002) 104 Cal.App.4th 677, 682.)

In a case like *Latinos Unidos*, where the time period in question runs from the performance of a specific *act* -- i.e., posting a notice -- Code of Civil Procedure section 12 provides certainty by letting the public know that the 30-day posting period begins the day after the notice was first posted and ends 30 days later, unless that day is a holiday, in which case it ends 31 days later.  In a case like the one before us, however, that same certainty is provided by *the specific dates* set forth in the notice that is made available to the public by letting the public know the *exact* 30-day period during which "copies of the proposed negative declaration or mitigated negative declaration . . . and all documents referenced in the proposed negative declaration or mitigated negative declaration [will be] available for review" (Guidelines, § 15072, subd. (g)(4)) and during which the lead agency will receive comments on the proposed negative declaration or mitigated negative declaration.  Where, as here, the public notice has actually been provided before the commencement of the public review period,[6] there is no need to invoke Code of Civil Procedure section 12 to avoid doubt or confusion because the notice gives the public advance notice of the 30-day period during which the pertinent documents will be available for review and during which the lead agency will receive comments. Accordingly, we conclude that Code of Civil Procedure section 12 did not apply here.

---

[6]     At the very least, the notice published in the local newspaper on August 6 satisfied Guidelines section 15072, subdivision (b)(1).  The mailing on August 4 may also have satisfied Guidelines section 15072, subdivision (b)(3), but whether it did or not is immaterial given the timely newspaper publication of the notice.

17

That does not mean, however, that the county complied with CEQA, because it remains true that the last three days of the 30-day public review period of which the county gave notice fell on the Labor Day weekend. Because the county offices were closed on those three days, the Romingers are correct that the county effectively truncated the public review period by three days. No one could have gone to the county offices on September 3, 4, or 5 to review the pertinent documents or to submit comments on the proposed mitigated declaration. Thus, under the circumstances here, the county effectively provided only a 27-day public review period, which did not comply with CEQA.

Obviously, we are not concluding that the lead agency's offices must be open, so that inspection may occur or comments may be submitted, each and every day of the 30-day public review period. Weekends and other holidays falling in the middle of the public review period still count toward the 30 days required. However, the *end* of the public review period cannot fall on a day when the lead agency's offices are closed without effectively making the period shorter than CEQA requires. Thus, while the counting begins with the starting date described in the notice pursuant to section 15072(g) of the CEQA Guidelines, if the ending date described in the notice falls on a weekend or other legal holiday, when the lead agency's offices are closed, then the noticed public review period is legally insufficient if that ending date is, as here, the 30th day of the period. For the noticed public review period to comply with CEQA, if the ending date is the 30th day, that date *must* be a date when the lead agency's offices are open.[7]

---

**7** If the lead agency notices a public review period that is *longer* than 30 days, that period may nonetheless be legally sufficient even if the closing date falls on a weekend or other holiday as long as the 30th day of the period falls on a date when the lead agency's offices are open.

18

The county's arguments that it complied with CEQA because "both notices indicating the [mitigated negative declaration] was available for review were published more than 30 days before the identified close of the comment period on September 5, 2011" and "the public review remained open through the close of the Planning Commission hearing on September 12, 2011" are to no avail because section 15072 of the CEQA Guidelines requires the lead agency to specify the *exact* dates of the public review period in its notice. Here, the county identified a period from August 7 to September 5 -- a period we have concluded was three days too short because the last three days did not count. The county cannot now claim that it actually provided a legally sufficient 30-day public review period because its notices were published prior to August 7 and because it would have continued to accept comments from the public up through the hearing on September 12. The period that must comply with CEQA is the period specified *in the notice* given to the public. Here, as we have said, that period did *not* comply with CEQA.

In a CEQA case, our review extends "only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (CEQA, § 21168.5.) By failing to provide a full 30-day public review period, the county did not proceed in the manner required by law and thereby abused its discretion. The question that remains is whether that abuse of discretion was prejudicial.

" 'Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown.' " (*Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351, 1384-1385.) "[N]oncompliance with the information disclosure provisions of [CEQA] which precludes relevant information from being presented to the public agency . . . may constitute a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of

19

whether a different outcome would have resulted if the public agency had complied with those provisions." (CEQA, § 21005, subd. (a).) However, "[i]nsubstantial or merely technical omissions are not grounds for relief." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)

Under the foregoing authorities, the Romingers are correct in asserting that traditional " 'harmless error analysis is inapplicable' " here. They are incorrect, however, in asserting that just "[b]ecause the County failed to comply with a mandatory requirement of CEQA, . . . 'the error is prejudicial' as a failure to proceed as required by law." Saying that traditional harmless error analysis does not apply means only that the Romingers do not have to show that the county would have reached a different conclusion regarding the project if the county had provided a 30-day public review period rather than the 27-day review period actually provided. At the same time, however, it is clear that because "there is no presumption that error is prejudicial" (CEQA, § 21005, subd. (b)), we cannot conclude that the Romingers are entitled to relief simply because the county failed to comply with CEQA. Thus, the Romingers' reliance on *Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 898 for the principle that "[f]ailure to comply with the CEQA procedures is necessarily prejudicial" is misplaced as that statement does not comport with either CEQA section 21005 or with the Supreme Court's decision in *Neighbors for Smart Rail*. Instead, we must look at the nature of the county's noncompliance to determine if it was of the sort that "preclude[d] informed decisionmaking and informed public participation." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority*, *supra*, 57 Cal.4th at p. 463.)

On the record here, we conclude no prejudice has been shown from the truncated public review period. The Romingers point to no evidence in the record that anyone who wanted to was prevented from reviewing the pertinent documents or from submitting comments on those documents because the last three days of the public review period coincided with the Labor Day weekend. Certainly no one appeared at the public hearing

20

to complain that this coincidence prevented them from participating in the review and comment process. At best, the Romingers assert that they "have no idea what would have occurred had the County provided the required notice." This necessarily means it is possible that *nothing different* would have occurred if the county had noticed the end of the public review period for September 6 -- the day after Labor Day -- rather than for September 5. To conclude under these circumstances that the county's error justifies overturning the county's decision would amount to presuming prejudice, which we cannot do.

On the record before us, we conclude that the county's error in setting the public review period for the proposed mitigated negative declaration was not prejudicial and does not provide a basis for relief in this action.

V

*The Romingers Have Failed To Show That Any Other Defects*

*In the County's Notices Were Prejudicial*

The Romingers contend the county's notices were defective because they were confusing, misleading, and contained incorrect hearing times, and these defects were prejudicial as a matter of law. We conclude that even if the county abused its discretion in any of these regards, the Romingers have failed to show prejudice and therefore are not entitled to any relief as a result of any such defects.

The notice of public hearing and intent to adopt a mitigated negative declaration for the Adams subdivision that the county issued on August 1, 2011, and that was published in the local newspaper on August 7 specified that "Colusa County Planning Commission will conduct a public hearing on September 12, 2011, at 9:00 a.m. in the Board of Supervisors Chambers in the Historic Courthouse, located at 547 Market Street, Colusa, and will make a recommendation to the Board of Supervisors." (Bolding omitted.) The public notice of availability/notice of intent the county issued on August 4 and mailed to various interested parties on August 5 specified that the time of the hearing

21

was 1:30 p.m. On September 6, however, the county mailed a corrected public notice of availability/notice of intent showing the time of the hearing as 9:00 a.m.

The Romingers complain that the August 1 notice was "misleading" because the planning commission did not actually make a recommendation to the board of supervisors but instead "took *action to approve* the [mitigated negative declaration] and the Project," requiring the Romingers "to affirmatively appeal the Planning Commission decision to the Board of Supervisors, pay an appeal fee, and seek to overturn a decision, rather than argue against a non-final recommendation." They further complain that the August 4 notice listed an incorrect hearing time and the corrected notice mailed on September 6 was not mailed sufficiently prior to the hearing.

We need not determine whether the "defects" the Romingers have purported to identify in the two notices amounted to an abuse of discretion by the county, because even if they did, we conclude the Romingers have failed to show that any such abuse of discretion was *prejudicial*. We have explained already that noncompliance with CEQA's information disclosure requirements is not presumed prejudicial. The authorities the Romingers cite for the contrary proposition are not persuasive here. *Plaggmier v. City of San Jose* (1980) 101 Cal.App.3d 842, in which the appellate court treated an error in the direct mailing of notice as prejudicial without directly discussing the issue of prejudice (see *id.* at pp. 856-857), predates the enactment of CEQA section 21005 and is inconsistent with that statute (discussed above). *Sounhein v. City of San Dimas* (1992) 11 Cal.App.4th 1255 involved "the complete omission of any public notice or hearings," which the appellate court concluded "was not a mere minor technical defect" but instead constituted a fundamental flaw in the process of adopting a zoning ordinance. (*Id.* at p. 1260.) Here, by contrast, there was at most a misidentification of the hearing time in one of two notices and an inaccurate description of the planning commission's role in the process. The Romingers fail to show why these are not most reasonably characterized as insubstantial or merely technical errors under *Neighbors for Smart Rail*.

22

Finally, the Romingers cite *Horn v. County of Ventura* (1979) 24 Cal.3d 605, 617, which (as relevant in this case) holds only that "where, as here, prior notice of a potentially adverse decision is constitutionally required, that notice must, at a minimum, be reasonably calculated to afford affected persons the realistic opportunity to protect their interests." The Romingers fail to show how the minor "defects" they have identified in the two notices issued here deprived any affected persons the realistic opportunity to protect their interests. The closest the Romingers come to making such a showing is their argument that "at least one member of the public . . . missed the Planning Commission meeting by appearing at 1:30 p.m., when the meeting had already started at 9:00 a.m. and concluded that morning." The evidence the Romingers cite, however, shows that this individual communicated to the board of supervisors, in advance of the hearing on the Romingers' appeal, the information he indicated he would have presented to the planning commission. The Romingers assert that "[t]here is no way to know what impact [this individual]'s testimony might have had on the Planning Commission or what would have occurred had the County provided proper notice," but this assertion achieves nothing for two reasons. First, it implicitly concedes that there might have been *no* impact from the individual's testimony, which means the Romingers are again in the position of arguing a *presumption* of prejudice, which the law does not permit. And second, because the Romingers appealed the planning commission's decision to the board of supervisors, and because this individual was able to express his views to the board during that process, it is not material what the planning commission might have done. Under the circumstances here, the Romingers have failed to show that the "defects" in the county's notices precluded informed decisionmaking and informed public participation. Accordingly, any abuse of discretion was not prejudicial.

## VI

*The Mitigated Negative Declaration Did Not Fail*

*To Analyze The "Whole" Of The Project*

The Romingers contend that by failing to consider various reasonably foreseeable activities that could occur as a result of the development of the subdivided property, the county improperly failed to analyze the "whole" of the project. We disagree. The mitigated negative declaration analyzed the reasonable scenario that agriculturally-related industrial development will occur on the subdivided property. To the extent the Romingers complain that certain specific "permitted uses" -- including "food or plastic processing plants or truck terminals" -- "could develop on the newly subdivided land without *any* environmental review" and thus the county's failure to analyze those particular uses amounted to a prejudicial abuse of discretion, we find no merit in that complaint. The question is whether the unanalyzed uses are a "reasonably foreseeable consequence" of the Adams subdivision and whether "the future . . . action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1360.) But the Romingers do not point to any evidence in the record that these particular uses are a reasonably foreseeable consequence of the subdivision, nor do they show how the impacts of these uses would vary significantly from the general agriculturally-related industrial development the mitigated negative declaration analyzed. Under these circumstances, no impermissible piecemealing of the project has been shown.

VII

*A Mitigated Negative Declaration Was Inappropriate Here*
*Because There Is Substantial Evidence In The Record To Support A Fair Argument*
*That The Project May Have Significant Unmitigated Impacts On Traffic*

"CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment. [Citation.]

"If the initial study identifies potentially significant effects on the environment but revisions in the project plans 'would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur' and there is no substantial evidence that the project as revised may have a significant effect on the environment, a mitigated negative declaration may be used. [Citation.] As the state Office of Planning and Research discussion following Guidelines section 15070 explains: 'A Mitigated Negative Declaration is not intended to be a new kind of document. . . . [¶] [It] provides efficiencies in the process where the applicant can modify his project to avoid all potential significant effects. The applicant can avoid the time and costs involved in preparing an EIR and qualify for a Negative Declaration instead. The public is still given an opportunity to review the proposal to determine whether the changes are sufficient to eliminate the significance of the effects.' " (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389-390.)

" 'A trial court . . . reviews an agency's decision to adopt a negative declaration using the "fair argument" test. Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant effect on the environment. [Citations.] "If such evidence is found, it cannot be overcome by substantial evidence to the contrary." ' [Citation.] ' " 'Stated another way, the question is one of law, i.e., "the sufficiency of the evidence to support a fair argument." [Citation.] Under this standard, deference to the agency's determination

25

is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary . . . .' Thus, the applicable standard of review appears to involve a question of law requiring a certain degree of independent review of the record, rather than the typical substantial evidence standard which usually results in great deference being given to the factual determinations of an agency." ' [Citation.] Thus, we conduct our review independent of the trial court's findings." (*Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, 841-842.)

Here, the Romingers contend the county prejudicially abused its discretion in failing to prepare an EIR rather than a mitigated negative declaration because the record contains substantial evidence supporting a fair argument that the Adams subdivision may have significant environmental impacts in a number of areas notwithstanding the mitigation measures contained in the mitigated negative declaration. According to the Romingers, the areas in which those significant impacts may occur are: (1) agriculture, (2) traffic, (3) odor, (4) noise, (5) air quality, (6) greenhouse gas emissions, and (7) water supply. Addressing each area in turn, we conclude the Romingers' arguments have merit only in the area of traffic.

A

*Agriculture*

In determining that the Adams subdivision will not have a significant impact on agricultural farmland, the county applied the following standard of significance:

"The loss or conversion of agricultural land within Colusa County shall be determined to be significant if the following conditions are met:

"• The land is designated as Prime Farmland, Unique Farmland, or Farmland of Statewide Importance **AND** is designated by the Colusa County General Plan OR Colusa County Zoning Ordinance as Agricultural land.

"• The land is under an active Williamson Act Contract."

26

The county explained that "[a]lthough a portion of the proposed project site is designated as Prime Farmland by the California Department of Conservation it is not designated by the Colusa County General Plan or Colusa County Zoning Ordinance for agricultural use.  The County previously analyzed the impacts of designating the project site and surrounding vicinity from Exclusive Agriculture (E-A) to Industrial (M) in the Mitigated Negative Declaration prepared for the project, '*Ratification of Amendments to the Colusa County General Plan (#00-10-1) and Zoning Ordinance. (#00-10-1)*', State Clearinghouse #2004129037.  In the previously adopted document, the County determined the impacts of redesignating the land to industrial uses as less than significant because the redesignation resulted in a loss of 0.00016 percent of the Prime Farmland in Colusa County.  Additionally the proposed project site is not under an active Williamson Act Contract."  The county then concluded as follows:  "Although the proposed project site is partially designated as Prime Farmland, it is not under a Williamson Act Contract, or designated by the Colusa County General Plan or Colusa County Zoning Ordinance for agricultural use.  According to Colusa County's standard of significance the proposed project will have a *less than significant* impact on agricultural re[s]our[c]es."

The Romingers' challenge to this aspect of the mitigated negative declaration has two aspects.  First, they question the county's right to apply a standard of significance different from the standards found in the sample checklist for an initial study contained in appendix G of the Guidelines.  Second, they contend the county cannot rely on its prior analysis as part of the 2004 general plan amendment and rezone.  Essentially they contend that notwithstanding the application of what they characterize as the county's "artificially low threshold" of significance, and notwithstanding the county's earlier analysis in the mitigated negative declaration for the general plan amendment and rezoning, the Adams subdivision may have a significant impact on agricultural resources

27

because the development of the property will "likely result in the conversion of up to 113 acres of Prime Farmland to non-agricultural use."

We begin with the Romingers' challenge to the county's standard of significance. Effectively, the county's standard treats the loss or conversion of agricultural land within the county as significant only if the land is designated as prime farmland, unique farmland, or farmland of statewide importance *and* is designated by the Colusa County general plan or the Colusa County zoning ordinance as agricultural land, or the land is under an active Williamson Act contract. Because the land at issue here is not under an active Williamson Act contract and is zoned for industrial use, the county considers the loss of this farmland less than significant.

The Romingers effectively contend that the county abused its discretion by using its own standard of significance because that standard is (in the Romingers' eyes) inconsistent with the standard of significance on the same subject contained in appendix G of the Guidelines. "[A]ppendix G of the Guidelines, 'Environmental Checklist Form' . . . . , along with appendix H 'Environmental Information Form,' is designed to be used as an initial study to determine if a project may have a significant effect on the environment. (See Guidelines, § 15063, subds. (a) & (f).) The checklist consists of sample questions divided into categories of potential physical impacts a project may have . . . ." (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1110.) The first question in the checklist under the heading "Agricultural Resources" asks whether the project would "Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Farmland), as shown on the maps prepared pursuant to the Farmland Mapping and Monitoring Program of the California Resources Agency, to non-agricultural use."

According to the Romingers, under this standard of significance from appendix G, "a project has a significant environmental effect if it converts Prime Farmland to non-agricultural use," which the Adams subdivision would do. But since the county's

28

standard of significance also requires the land in question to be designated by the Colusa County general plan or the Colusa County zoning ordinance as agricultural land, which the land in question is not, the county's use of its own standard of significance -- again, in the Romingers' view -- allows the county to avoid a finding of significant effect. Thus, the Romingers contend the county's reliance on its own standard of significance is improper.

The Romingers' argument is flawed for several reasons. First, the Guidelines make clear that the checklist form in appendix G is "only suggested, and public agencies are free to devise their own format for an initial study." (Guidelines, § 15063, subd. (f).) Furthermore, "CEQA grants agencies discretion to develop their own thresholds of significance (CEQA Guidelines, § 15064, subd. (d))." (*Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1068.) "To require any deviation from [the standards of significance in appendix G] to be documented and justified . . . is to elevate Appendix G from a suggested threshold to the presumptive threshold. This flatly contradicts both CEQA's description of Appendix G as only suggested and CEQA's mandate that agencies have the power to devise their own thresholds." (*Save Cuyama Valley*, at p. 1068.)

The Romingers try to discount *Save Cuyama Valley* by asserting that "[t]he question addressed in th[at] case[] was whether the EIR's conclusions were supported by substantial evidence, *not* whether there was substantial evidence of a fair argument of an impact in the context of a negative declaration." In other words, the Romingers suggest that a lead agency's discretion to adopt its own standards of significance is more restricted if the agency uses its own standard "to support a decision *not* to prepare an EIR" -- at least when application of a corresponding standard of significance from appendix G would mandate the contrary decision. But the Romingers offer no authority, or even any reasoning, supporting their assertion that the county's right to adopt its own standard of significance was more limited here because of the context in which the

29

county used that standard. Absent such support, the Romingers' assertion is unpersuasive.

Moreover, the Romingers' argument rests on a fundamental misunderstanding of appendix G and the sample questions set forth in the checklist therein. "The person filling out the form [in appendix G] can check one of four boxes in response to each question: potentially significant impact, potentially significant unless mitigation incorporated, less than significant impact, and no impact." (*Protect the Historic Amador Waterways v. Amador Water Agency*, *supra*, 116 Cal.App.4th at p. 1110.) Thus, contrary to the Romingers' argument, even under appendix G, a project does not necessarily have a significant environmental effect just because "it converts Prime Farmland to non-agricultural use." The sample questions in appendix G are not simply yes-or-no propositions. " ' "Potentially Significant Impact" is [the] appropriate [answer] if there is substantial evidence that an effect may be significant.' " (*Amador Waterways*, at p. 1110.) Thus, even using the checklist in appendix G, a lead agency would have to evaluate the evidence to determine whether the conversion of prime farmland to nonagricultural use might constitute a significant effect on the environment; such conversion is not *ipso facto* a significant effect, as the Romingers contend. To that extent, the Romingers' challenge to the county's use of its own standard of significance here is without merit because that challenge rests on a misunderstanding and misapplication of the standards in appendix G of the Guidelines.

As for the Romingers' argument that the county cannot rely on its prior analysis of this land as part of the 2004 general plan amendment and rezone, we do not perceive that the county's mention of this prior analysis was material to its conclusion that the Adams subdivision would not have a significant effect on agricultural resources because applying its standard of significance as it did, the county would have found no significant effect regardless of the prior analysis.

30

The Romingers contend that "even if a lead agency has discretion in setting thresholds of significance, if evidence is presented tending to show an actual environmental impact, despite the adopted signfican[ce] standard, the agency cannot ignore the impact." In this regard, the Romingers are correct. (See *Protect the Historic Amador Waterways v. Amador Water Agency*, *supra*, 116 Cal.App.4th at pp. 1109-1111.) A lead agency cannot avoid finding a potentially significant effect on the environment by rotely applying standards of significance that do not address that potential effect. (See *id.* at p. 1111.) But the Romingers point to no evidence that that happened here. Here, the county applied a standard of significance under which the conversion of prime farmland to nonagricultural use is considered less than significant if that land has already been designated for nonagricultural use in the county's general plan or zoning regulations. If the Romingers could point to substantial evidence in the record that the conversion of the specific 113 acres at issue here might constitute a significant effect on the environment notwithstanding the county's standard of significance, then it is true that the county could not avoid its obligation to prepare an EIR by rotely relying on its standard. *But the Romingers fail to point to any such evidence*. Instead, in the end, the Romingers' argument rests solely on their misapplication of appendix G and the mistaken proposition that the conversion of *any* prime farmland to nonagricultural use may be considered a significant effect, no matter how much land is being converted or how much prime farmland remains unconverted.

The question here is whether, notwithstanding the county's application of its standard of significance regarding the conversion of prime farmland to nonagricultural use, the Romingers have raised a fair argument based on substantial evidence that the change in the use of the land at issue here may constitute a *significant* effect on the environment, given the evidence that the land is already zoned for industrial use and that

31

the amount of farmland at issue is very small when viewed on a county-wide basis.[8] We conclude that the Romingers have not raised any such argument. Accordingly, their challenge to the agricultural resources element of the mitigated negative declaration is without merit.

B

*Traffic*

The initial study analyzed "potential transportation and circulation impacts resulting from ultimate development of the proposed project site" and concluded that those impacts would be less than significant. The traffic study focused on four intersections in the vicinity of the proposed subdivision, including the intersection of Old Highway 99 West and County Line Road, which lies at the southwest corner of the proposed project.

Part of the traffic analysis included "project trip generation." As explained in the traffic impact study on which the initial study relied, "[p]roject trip generation is a process for estimating the amount of vehicular traffic the proposed project would have on the surrounding roadway networks." The traffic impact study explained that "[t]he proposed project trip generation information was based on the proposed action information provided by the applicant regarding the tentative subdivision map and an adjusted trip generation rate based on the existing agriculture/industrial uses on the proposed project in lieu of those traditionally found in the Institute of Transportation Engineers (ITE) Trip Generation, 8th Edition." An adjacent table showed that the proposed project trip generation rate used in the traffic analysis was 7.2 trips daily per acre, with a trip rate of .60 in the morning peak hour and a rate of .63 in the evening peak hour.

---

[8]   The county points to evidence that there are approximately 225,000 acres of prime farmland within its boundaries. Only 113 acres are at issue here.

32

In support of comments they submitted on the initial study, the Romingers produced a letter from a traffic engineer, Daniel Smith, who asserted that the traffic analysis in the initial study "relie[d] on an unrealistically low trip generation estimate." Among other things, Smith took issue with the decision to base the projected trip generation rate on "existing agriculture/industrial uses on the proposed project in lieu of those traditionally found in the Institute of Transportation Engineers (ITE) Trip Generation, 8th Edition." Smith was of the opinion that, "considering the proximity and accessibility of the site to Interstate 5 and the fact that agricultural use in the area is fully developed or even declining, a more probable assumption is that the proposed parcels currently in agricultural use would likely be developed in uses permitted within the industrial zoning that would be taking advantage of the site's freeway accessibility rather than being agricultural-serving. As such, they would more likely have trip generation characteristics better represented by the categories 'general light industry' or 'heavy industry' in the authoritative trip generation source reference *Trip Generation*, *8th Edition* rather than the existing agricultural-support uses on some portions of the site. Moreover, the 45+ acres currently developed in agricultural-support light industrial uses could be redeveloped as more traffic-intense uses best characterized by the trip rates in *Trip Generation*, *8th Edition* than by the rate asserted by the applicant."

Smith explained that "[t]rip generation for the 114+ acres of current agricultural use on the site that would presumably be redeveloped to industrial use or uses permitted in industrial zoning would be vastly greater if compiled according to the rates in *Trip Generation, 8th Edition* rather than those in the [initial study/mitigated negative declaration] estimates based on the purported generation of the existing agricultural support industry already on site." Pursuant to the "authoritative publication," "trip generation rates for the category 'general light industry' are roughly 10 times higher than those assumed in the . . . traffic impact study on a daily basis and 15 times higher on [a morning or evening] peak hour basis. The same rough proportions, 10 times higher on a

33

daily basis and 15 times higher on [a morning or evening] peak hour basis, [are] also indicated for the category 'industrial park.' "

Smith went on to explain that the greater traffic generated under the projections from the Trip Generation publication could potentially have a significant impact on the intersection of County Line Road and Old Highway 99 West (also known as State Highway 99 or SR 99). According to Smith, "there is a railway grade crossing immediately to the east [of the intersection]. . . . Because the limits of the railroad grade crossing of County Line Road are only about 150 feet from the limits of [its] intersection with SR 99, there is only stacking space for about six passenger vehicles when the grade crossing is blocked by trains, and for even fewer vehicles when heavy trucks are in the mix, before traffic backs up into the SR 99 intersection. Because the agricultural processing facilities between SR 99 and the rail line obscure sight distance to the grade crossings for vehicles approaching northbound or southbound on SR 99 that intend to turn onto County Line Road eastbound, such vehicles, unaware that the grade crossing is blocked, could pile into the rear of the waiting traffic queue."

In responding to the foregoing comments, the county's staff and consultant asserted that "[i]t is impossible and would be inaccurate to attempt to quantify all potential future development on the project site" and that "[i]f specific development proposals are presented which are more intensive than what was analyzed in the [mitigated negative declaration] (e.g. would produce traffic trips in excess of those calculated in the [traffic impact study]) then the individual project would be subject to its own independent CEQA review, and possibly further traffic impact analysis."

On appeal, the Romingers contend "[t]he record contains substantial evidence of a fair argument of unanalyzed traffic impacts in the form of the expert opinion by a qualified traffic engineer who based his conclusions on the [mitigated negative declaration] and supporting traffic study" and therefore "[t]he [mitigated negative

declaration] should be set aside in favor of an EIR." On this element of the mitigated negative declaration, we agree.

The question here, essentially, is whether Smith's opinion amounts to substantial evidence supporting a fair argument that the Adams subdivision may have a significant impact on the environment because of the potential impact of the project on traffic at the intersection of Old Highway 99 and County Line Road, as detailed above. In large part, the county fails to address this question. For example, the county contends that because the landowner "did not initiate any specific development plans associated with [the] project application . . . , the County properly (and in good faith) relied on the existing agricultural/industrial uses on the proposed project site to ascertain a trip generation rate." This is the equivalent of arguing that there was substantial evidence to support the county's conclusion that the project would not have a significant impact on traffic in the area. In fact, the county actually goes on to expressly argue that its "assumptions regarding trip generation are supported by substantial evidence." But that is not the issue before us. Whatever the evidence may have been that supported the county's conclusions, we are concerned here with whether there was substantial evidence to support a fair argument that the county was wrong and that the project may have a significant impact on traffic in the area. As we have previously suggested, we can uphold the county's decision not to require an EIR only if there is *no credible evidence* that the project may have a significant impact. (*Baldwin v. City of Los Angeles*, *supra*, 70 Cal.App.4th at p. 842.)

To the extent the county addresses the question before us, the county asserts that the Romingers' "conjecture that a different trip generation assumption applies is not based on factual evidence." But it is, because it is based on the opinion of the Romingers' traffic expert as to the likely use of the subdivided property, which the expert supported by reference to specific facts, i.e., "the proximity and accessibility of the site to Interstate 5 and the fact that agricultural use in the area is fully developed or even

35

declining." The only challenge the county offers to the expert's opinion is that Smith "analyzed the consequences of unknown future development, not of the [Adams] Subdivision." According to the county, "there is nothing in the record to suggest that there will, in fact, be 'general light industrial' or 'industrial park' development on the property." But Smith explained in his letter why it was reasonable to assume that the development on the subdivided property will probably not be "agricultural support light industry, with traffic generating characteristics similar [to] such uses already on site," but instead will probably be of a sort "more likely [to] have traffic generation characteristics better represented by the categories 'general light industry' or 'heavy industry.' " For our purposes, the question is not whether Smith's opinion constitutes proof that the greater traffic generating industrial development *will* occur in the subdivision. Rather, the question is whether Smith's opinion constitutes substantial, credible evidence that supports a *fair argument* that such development *may* occur and that, as a result, the greater traffic generated by such development *may* have a significant impact on the environment surrounding the project, and therefore an EIR was required. The answer to that question is "yes," and none of the county's arguments support a contrary conclusion. Accordingly, the county prejudicially abused its discretion when it failed to prepare an EIR addressing the potentially significant impact of the project on traffic at the intersection of County Line Road and Old Highway 99 West.

C

*Odor*

The initial study addressed potential odors from the project as follows:

"The proposed project site is located in a rural area of unincorporated Colusa County. The proposed project will [*sic*] consists of agricultural related industrial developments of similar nature to the existing industrial developments located within boundary of the proposed project site. The proposed uses are not expected to generate significant odorous emissions that could expose a substantial number of people to

36

objectionable odors. Nonetheless, because the project's future land uses are undetermined, there is the potential that the project could cause a significant impact. If a proposed project is determined to result in potential odor problems, mitigation measures should be identified. For some projects, add-on controls or process changes, such as carbon absorption, incineration or an engineering modification to stacks/vents, can reduce odorous emissions.

"The potential for odor impacts from the project is *potentially significant*."

Based on this analysis, the initial study proposed the following mitigation measure (3.3.8): "If a future project use will generate odorous emissions or is a type of operation identified in Table 2-2 of the Butte County APCD CEQA Air Quality Handbook, prior to issuance of building permits the applicant shall consult with the CCAPCD and Colusa County Environmental Health Department to determine what type of engineering controls or other odor-reduction measures can be implemented. The odor-reduction measures shall be installed in accordance with accepted engineering practice." (Italics added.)

As ultimately adopted by the county, mitigation measure 3.3.8 provides in full as follows: "Prior to issuance of building permits, the project applicant shall consult with the Colusa County Air Pollution Control District and the Colusa County Environmental Health Department to determine if their project operations would result in an odor source locating next to potential receptors within distances indicated in Table 2-2 of the Butte County Air Quality Management District's CEQA Air Quality Handbook. The CCAPCD and Colusa County Environmental Health Department shall recommend feasible odor mitigation measures, including but not limited to: add-on controls or process changes, such as carbon absorption, incineration or an engineering modification to stacks/vents that are applicable to the specific project operations. Applicable mitigation measures recommended by the CCAPCD and the Colusa County Environmental Health Department shall be installed in accordance with accepted engineering practice. Prior to issuance of final Certificate of Occupancy, the project applicant shall provide evidence

37

demonstrating that recommendations from the CCAPCD and Colusa County Environmental Health Department have been incorporated into the project plans. Furthermore, for projects that cannot fully mitigate their impacts with odor mitigation measures as determined by the CCAPCD and Colusa County Environmental Health Department, additional environmental review shall be required."

The Romingers contend the proposed mitigation measure contained in the initial study "is inadequate for two reasons." First, they contend "there is no indication that the amorphous 'engineering controls or other odor-reduction measures' will even be available or reduce odor impacts to less-than-significant." Second, they contend that "requiring the applicant to 'consult' with CCAPCD and CCEHD impermissibly defers a formulation of an actual mitigation to a future date and fails to include any meaningful performance standard." In support of both arguments, the Romingers cite a letter from their air quality consultant, which states in relevant part as follows: "[I]t is important to note that some land uses, particularly those associated with agricultural production, may result in significant odor-related impacts to nearby receptors, even with the implementation of available emissions control technologies. In some instances, adequate emissions control technology may not be available to reduce this impact to a less-than-significant level. This mitigation measure, as currently written, would not necessarily preclude odor sources from being installed that could still have a potentially significant impact to nearby sensitive land uses, even with incorporation of engineering controls. Therefore, incorporation of available emissions control technologies, in and of itself, is not sufficient to reduce this impact to a less-than-significant level. Furthermore, the proposed mitigation measure fails to identify the performance standards to be used for the evaluation of future land uses, with regard to odor generation. It is, therefore, recommended that this measure be revised to identify the specific thresholds to be used for the evaluation of the odor potential associated with future onsite land uses. Given the

38

proximity of nearby receptors and prevailing wind directions, the installation of major odor-generating uses at this location should be prohibited."

As the Romingers recognize, the operative question here is whether the record contains substantial evidence supporting a fair argument that the Adams subdivision may have significant odor impacts notwithstanding the mitigation measure the county adopted in approving the mitigated negative declaration. With this in mind, the most significant problem with the Romingers' arguments is that the letter from their air quality consultant on which those arguments are based is too vague to amount to substantial evidence supporting a fair argument of significant odor impacts notwithstanding the mitigation measure to which the county has committed itself. The consultant generally concludes that the installation of emissions control technology may not be sufficient to reduce the impact of the project to less than significant because "[i]n some instances, adequate emissions control technology may not be available." The consultant does not identify what types of odors cannot be adequately mitigated with emissions control technology, nor does the consultant explain what land uses -- other than "some land uses . . . associated with agricultural production" -- might occur in the Adams subdivision that could produce such odors. Absent such specifics, we are unable to conclude that substantial evidence in the record supports a *fair* argument that the project may result in significant odor impacts notwithstanding the adopted mitigation measure.

To the extent the Romingers complain that mitigation measure 3.3.8 is inadequate because it amounts to "[u]nenforceable, deferred mitigation," we disagree. Contrary to the Romingers' assertions, the mitigation measure not only requires the applicant to consult with various agencies so that the agencies can "recommend feasible odor mitigation measures," it provides that any such recommended measures "shall be installed." To the extent the Romingers complain that mitigation measure 3.3.8 "fails to include any meaningful performance standard," they fail to explain what sort of performance standard *could* have been included given the uncertainty over exactly what

39

land uses may eventually occur in the Adams subdivision.  In the absence of such greater specificity, the Romingers' arguments are unpersuasive.  Accordingly, their challenge to the odor element of the mitigated negative declaration is without merit.

D

*Noise*

Although the Romingers' arguments on the issue of noise appear under a heading that asserts "[t]he record contains substantial evidence of a fair argument of potentially significant environmental impacts," the main thrust of their arguments on the issue of noise is actually a challenge to the adequacy of the discussion contained in the initial study that supported the mitigated negative declaration.  For example, they assert that the mitigated negative declaration's "noise discussion" -- which appears in the initial study -- "is flawed because it omits the data or analysis necessary to support the conclusion that noise impacts will be less-than-significant."  In support of this assertion, they cite *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, where the court stated that "although an initial study can identify environmental effects by use of a checklist [citation], it must also disclose the data or evidence upon which the person(s) conducting the study relied.  Mere conclusions simply provide no vehicle for judicial review."

What the Romingers fail to acknowledge is that this passage from *Citizens* was qualified by the same court in *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1377-1379.  In *Gentry*, the plaintiff argued that "under *Citizens*, an initial study must disclose sufficient evidence to support each and every one of its findings."  (*Gentry*, at p. 1378.)  The  court expressly disagreed, explaining as follows:

"In *Citizens*, we required an initial study to disclose the evidence upon which it is based in order to afford a basis for judicial review.  However, we did not hold that the failure of an initial study to disclose the evidence supporting particular findings would necessarily be fatal to the resulting negative declaration.  There is 'no authority . . . that

40

an initial study is inadequate unless it amounts to a full-blown EIR based on expert studies of all potential environmental impacts. If this were true, the Legislature would not have provided in CEQA for negative declarations.' [Citation.]

" 'The agency [will] not be allowed to hide behind its own failure to gather relevant data. . . . CEQA places the burden of environmental investigation on government rather than the public. If the local agency has failed to study an area of possible environmental impact, a fair argument may be based on the limited facts in the record. Deficiencies in the record may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences.' [Citations.]

"However, the ultimate issue is not the validity of the initial study, but rather the validity of the lead agency's adoption of a negative declaration. Even if the initial study fails to cite evidentiary support for its findings, 'it remains the appellant's burden to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact.' [Citation.] 'An absence of evidence in the record on a particular issue does not automatically invalidate a negative declaration. "The lack of study is hardly evidence that there *will* be a significant impact." ' " (*Gentry v. City of Murrieta*, *supra*, 36 Cal.App.4th at pp. 1378-1379, fn. omitted.)

We have reviewed the Romingers' noise argument with the foregoing principles in mind, and we do not find anywhere where the Romingers adequately assert that there is substantial evidence in the record to support a fair argument that the Adams subdivision may have a significant environmental impact in the area of noise. They vaguely refer to their "expert['s] opinion of the probable future consequences of the Project," but they do not directly inform us what that opinion was or how that opinion supports a fair argument that the project may have a significant impact on noise levels. A page earlier, they refer to "evidence" from which the county should have concluded, based on "the noise generated by the proposed Project," that "noise levels at the nearest residence . . . would

41

exceed the County's applicable daytime and nighttime maximum allowable noise standards." This evidence may be the "expert opinion" the Romingers later refer to, but that is not clear from their brief, and it is not for us to construct a sufficient argument for them from the disparate parts of the argument they chose to put together themselves, which focuses on the asserted inadequacy of the initial study rather than on the existence of substantial evidence in the record to support a fair argument that the project may have a significant environmental impact. Accordingly, we conclude the Romingers' challenge to the noise element of the mitigated negative declaration is without merit.

E

*Air Quality*

The initial study supporting the mitigated negative declaration concluded that projected construction activities for the Adams subdivision would result in estimated daily emissions of $NO_x$ that would be potentially significant, so mitigation measures (measures 3.3.2 and 3.3.3) were proposed to address that issue. At the same time, the initial study concluded that estimated daily emissions of ROG and $PM_{10}$ would not exceed the applicable thresholds of significance.

The Romingers first take issue with the latter conclusion, contending they offered expert evidence based on different data showing that estimated daily construction emissions of ROG and $PM_{10}$ *would* exceed the applicable thresholds of significance. We need not consider this argument in detail, however, because even if the Romingers are correct on this point, it appears the mitigation measures proposed to address the excess emission of $NO_x$ during construction (measures 3.3.2 and 3.3.3) would also cover any excess emissions of ROG and $PM_{10}$. At the very least, the Romingers have made no attempt to point to any evidence supporting a fair argument that those mitigation measures would be insufficient to reduce potential emissions of ROG and $PM_{10}$ to below the threshold of significance.

The Romingers next argue that the mitigated negative declaration "contains unenforceable and deferred mitigation for air quality impacts."[9] First, they take issue with a passage in the initial study that provides as follows: "[F]uture development within the proposed subdivision will comply with the [Colusa County Air Pollution Control] District's Rules and Regulations including the payment of an Indirect Source Review Fee (Rule 4.8).[10] Development subject to the [district] permitting requirements will obtain an Authorization to Construct from the [district], which will ensure that the operation of any facility within the proposed subdivision considered a stationary source will not interfere with the attainment or maintenance of ambient air quality standards."[11] The Romingers complain that "[a]lthough worded as a feature of the Project, th[ese] requirement[s] [are] not part of the Project description, and the applicant is not required through any legally binding instrument to comply with [them]. Therefore, the requirement[s] [are] not . . . enforceable . . . ." What the Romingers fail to recognize is that this passage actually summarizes provisions contained in proposed mitigation measure 3.3.5, which appears later in the study and which was adopted by the county. The Romingers do not challenge the adequacy of that mitigation measure, so their challenge to the earlier passage from the study is without merit.

Next, the Romingers take issue with mitigation measure 3.3.1, which provides that "[p]rior to issuance of grading permits for the project site, and at the County's discretion, the applicant shall prepare and submit a fugitive dust control plan for review and

---

**9** These arguments do *not* encompass mitigation measures 3.3.2 and 3.3.3, discussed in the previous paragraph, which address potential excess emissions during construction.

**10** We will refer to the Colusa County Air Pollution Control District as the district.

**11** In their brief, the Romingers do not quote this passage accurately. We have included the passage as it appears in the initial study.

approval to the [district]." The Romingers complain that "[t]his mitigation measure is unenforceable because it contains no standards to ensure its adequacy. There is no mandate requiring the applicant to do anything; it is left to the County's 'discretion.'" It is true that a public agency that adopts a mitigated negative declaration must "provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures." (CEQA, § 21081.6, subd. (b).) The Romingers have not shown any violation of this requirement, however. The county's retention of discretion to require the applicant to prepare and submit a fugitive dust control plan does not render this mitigation measure unenforceable because any abuse of that discretion by the county could be remedied through the courts in mandamus. (See, e.g., *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 247 ["mandamus . . . is available to correct a public agency's abuse of discretion"].) At the very least, the Romingers have not shown or even argued otherwise. Thus, we conclude the Romingers' challenge to the air quality element of the mitigated negative declaration is without merit.

F

*Greenhouse Gas Emissions*

The initial study concluded that "the project would achieve a 35 percent reduction in business-as-usual [greenhouse gas] emissions through compliance with regulatory measures." The Romingers complain that the mitigated negative declaration is "inadequate" because it does not "quantify[] the baseline . . . emissions, or compar[e] the proposed Project's . . . emissions to the baseline . . . emissions." As we have explained already, however, the appellant's burden in challenging the adoption of a negative declaration is to "'demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact.'" (*Gentry v. City of Murrieta*, *supra*, 36 Cal.App.4th at p. 1379.) The Romingers fail to carry that burden here. They do not cite any evidence in the record or offer even a suggestion of a

44

fair argument as to why the Adams subdivision may result in significant environmental impact through greenhouse gas emissions.

The Romingers also complain that the mitigated negative declaration "improperly presumes that statewide mitigation measures will reduce [greenhouse gas] emissions for the Project to less-than-significant." The Romingers acknowledge that "a condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance." (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906.) They assert, however, that "we have no reason to expect such compliance here, particularly in light of the fact that no Project condition requires such compliance and the [mitigated negative declaration] contains no other evidence of the County's proposed method to ensure such compliance."

This argument fails in part because the " 'compliance with regulatory measures' " on which the initial study relies is not limited to compliance by the applicant or the ultimate user of the land at issue here. As the county explains, some of the reduction in greenhouse gas emissions "will result from newly applied standards, not [from] the County or the Real Party in Interest's own actions." To the extent, however, that the "regulatory compliance" at issue here *is* compliance by the applicant or by the ultimate land user, the Romingers offer no evidence to suggest that it would be unreasonable to expect such compliance here. Accordingly, the Romingers' challenge to the greenhouse gas emissions element of the mitigated negative declaration is without merit.

G

*Water Supply*

In the area of hydrology and water quality, the initial study concluded (among other things) that, with the adoption of mitigation measures addressing "well spacing and water management best practices," the project would not substantially deplete ground-

45

water supplies. This conclusion was based on a water supply assessment that was appended to the initial study.

The Romingers complain that the "[w]ater supply and demand figures [in the water supply assessment] are not properly supported." More specifically, they assert that the assessment "underestimate[s] the Project's potential demand by assuming the future use of the Project site will mirror the existing partially developed agricultural operations, and ignoring the reasonably foreseeable development allowed under the County's Code (e.g., food processing and manufacturing) as compared to existing uses." They also complain that the assessment "assum[es] that water conservation measures would voluntarily be implemented during dry years" and "estimates a water supply that is not supported by the record." On this latter point, the Romingers assert that the conclusion in the water supply assessment that "the existing on-site wells can sustainably yield 679 acre-feet per year" is unsupported because "[t]his yield is well in excess of the 23 acre-feet per year currently used on the Project site, yet the [water supply assessment] provide[s] no explanation of the discrepancy."

Addressing the very last point first, it is important to note that the fact that only 23 acre-feet per year are currently used on the project site has no bearing on the sustainable yield of the existing wells, at least not without some evidence that the wells are being operated at or near capacity. Absent such evidence, it is reasonable to assume that the existing uses on the project site simply do not require the wells to produce all (or anywhere near all) of the water they *could* produce. Thus, the Romingers' reliance on the current use of the wells is to no avail.

We also note that the water supply assessment specifically states that its conclusion that the existing wells can sustainably yield 679 acre-feet per year is "based on the results of pump test activities described in Section 2" and "[b]ased on aquifer characteristics." The Romingers make no effort to explain why these bases are not sufficient to support the conclusion drawn.

46

Turning to the Romingers' water supply arguments more broadly, we find it dispositive that, beyond complaining about supposed deficiencies in the water supply assessment, the Romingers make no effort to demonstrate that the record contains substantial evidence supporting a fair argument that the Adams subdivision may have a significant impact on groundwater supplies notwithstanding the county's conclusion to the contrary. Instead, they simply follow-up their list of supposed deficiencies in the water supply assessment with the bald assertion that the record contains such evidence. And in support of that assertion, they cite 13 pages of the administrative record without making an attempt to explain what is contained in those pages or why it is relevant. As it turns out, those pages consist of a five-page letter from a consultant purporting to evaluate the adequacy of the county's groundwater analysis, along with an eight-page curriculum vitae for the consultant. And while the Romingers' failure to explain the significance of this letter is by itself sufficient to defeat their arguments -- because, as we have previously explained, it is not for us to construct a sufficient argument for them -- we note that even the consultant states in his letter that his "review of the groundwater analysis is based on whether [the initial study/mitigated negative declaration] provides adequate substantial evidence to support its conclusions that groundwater resource impacts can be mitigated to less than significant consistent with the requirements of CEQA and relevant case law." In other words, the thrust of the consultant's criticism was apparently to attack the evidentiary basis for the county's conclusion that the project would not have a significant impact on groundwater supplies, rather than identifying or providing evidence to support a fair argument to the contrary.

For the foregoing reasons, the Romingers have failed to carry their burden of demonstrating by citation to the record the existence of substantial evidence supporting a fair argument that the project will have a substantial impact on groundwater. Accordingly, the Romingers' challenge to the water supply element of the mitigated negative declaration is without merit.

47

DISPOSITION

The judgment is reversed, and the case is remanded to the trial court with instructions to enter a new judgment granting the Romingers' mandamus petition with respect to the traffic element of the mitigated negative declaration only, as detailed above. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)




     ROBIE     , J.



We concur:



     RAYE     , P.J.



     BUTZ     , J.