Filed 9/10/20  Save Our Rural Town v. County of Los Angeles CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| SAVE OUR RURAL TOWN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>    Defendants and Appellants;<br><br>DOUGLAS GAUDI et al.,<br><br>    Real Parties in Interest and Appellants. | B294182<br><br>(Los Angeles County Super. Ct. No. BS166732) |

APPEAL from an order of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed, in part; remanded, in part.

Jackson Tidus, Alene M. Taber, Ballard Spahr, Brian D. Huben, for Plaintiff and Appellant.

Dušan Pavlović, Senior Deputy County Counsel, for Defendant and Appellant County of Los Angeles.

Poole & Shaffery, Hunt Braly, for Real Parties in Interest and Appellants.

---

## INTRODUCTION

Appellants and cross-respondents are the County of Los Angeles (County), together with real parties in interest Douglas and Joanna Gaudi, Paul Zerounian, and Robert Friedman (Applicants).  Respondent and cross-appellant is Save Our Rural Town (SORT).  The trial court issued a judgment granting a peremptory writ of mandate on SORT's first cause of action for violation of the California Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA),[1] and dismissing SORT's second through seventh causes of action.  The County and Applicants appealed, seeking clarification of the trial court's

---

[1] All further statutory references are to CEQA provisions as codified in Public Resources Code sections 21000–21177 unless otherwise indicated.  Where applicable, the CEQA guidelines (Cal. Code Regs., tit. 14, §§ 15000–15387) will be noted as "Guidelines" throughout the text to distinguish between the Public Resources Code and the Code of Regulations.

writ of mandate.  SORT argues that the appeal should be dismissed.  Following the appeal filed by the County and Applicants, SORT filed a cross-appeal, asking this court to reverse the trial court's determination that two of SORT's CEQA claims were not supported by substantial evidence of a fair argument that the Applicants' proposed project would have a significant impact on the environment.  SORT also contends the court erroneously found there was substantial evidence supporting the County's findings that the project was consistent with applicable land use plans and zoning.

We dismiss the appeal filed by the County and Applicants, because they have not sought any form of relief available on appeal.  We agree with SORT that there is substantial evidence of a fair argument that the two areas discussed in the briefing may cause a significant environmental impact.  We reject the rest of the arguments made in SORT's cross-appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

Our description of the factual and procedural background draws heavily from the trial court's extensive and detailed written ruling.

### A. The Proposed Project

Applicants seek to develop a parcel of real property in the rural community of Acton, located in an unincorporated

area of Los Angeles County, in the southwestern portion of the Antelope Valley, south of the City of Palmdale, along the 14 Freeway. The proposed project (the Project) would include a 3,300 square foot restaurant providing both dine-in and drive-through service, a 6,000 square foot retail building, and storage facilities.

## B. Administrative Proceedings

Between 2014 and 2017, the Project went through two separate but overlapping approval processes with the Planning Commission, each time with an appeal to the Los Angeles County Board of Supervisors (the Board).

### 1. 2014 Conditional Use Permit

The Applicants sought a conditional use permit (the 2014 CUP) for the Project. The Planning Commission prepared an initial study and proposed certifying a negative declaration under CEQA. As will be explained in more detail later, there were two traffic studies—one dated January 20, 2015 and a second dated August 5, 2015—but only the earlier traffic study was made available to the public. In April 2016, the Planning Commission certified a negative declaration and approved the 2014 CUP without the drive-through restaurant portion of the Project. Explaining its decision to approve the Project without the drive-through, the Planning Commission stated that while a

4

drive-through was not a "high-intensity use," it would be disruptive to Acton's rural character because the property is adjacent to the 14 Freeway, and therefore would provide a convenient dining option that would attract travelers.

Zerounian, the restaurant owner, appealed the Planning Commission's decision to eliminate the drive-through from the Project, bringing the matter to the Board. By November 2016, the Board had certified the negative declaration, and adopted findings and conditions stating, in relevant part, that even with the drive-through, the 2014 CUP and Project: (1) would not draw substantial traffic from the freeway; (2) is consistent with the Antelope Valley Area Plan; and (3) complies with the County's zoning codes.

## 2. 2016 subdivision approval

In February 2016, while the 2014 CUP application was still pending before the Planning Commission, the Applicants initiated a second proceeding by seeking approval to subdivide the property, separating the retail building and the drive-through restaurant into two separate parcels (the Parcel Split). In February 2017, the Planning Commission approved the Parcel Split and certified an addendum to the negative declaration for the 2014 CUP. SORT appealed, bringing the matter to the Board. In October 2017, the Board adopted findings that (1) the Parcel Split did not change the scope or nature of the 2014 CUP and did not result in significant environmental effects not discussed in

5

the negative declaration for the 2014 CUP, and (2) that no new information of substantial importance arose related to the Parcel Split that would result in significant environmental impacts not discussed in the negative declaration.

## C. Writ Proceedings

Shortly after the Board approved the 2014 CUP, SORT filed its initial petition for writ of mandate. A first amended petition was filed after the Board approved the Parcel Split. On July 27, 2018, the court issued a detailed written ruling. It concluded that the County violated CEQA when it failed to make the August 4, 2015 traffic study available to the public before the certifying the negative declaration and approving the 2014 CUP with a drive-through. The court further found that SORT had identified substantial evidence supporting a fair argument that the overall Project (referring to both the 2014 CUP approval and the Parcel Split) may cause significant transportation impacts. Specifically, the court found substantial evidence supporting a fair argument that the Project may require installation of traffic signals, and the County had not analyzed that potential traffic impact. There was also substantial evidence to support a fair argument that the Project might exacerbate pedestrian hazards, which the County also failed to analyze in its initial study. The trial court rejected a number of SORT's other arguments, finding insufficient evidence to support a fair

6

argument, including two arguments relevant to this appeal: (1) that the Project would cause traffic delays at a specific intersection in Acton; and (2) the Project would cause specified traffic delays based on the number of cars anticipated to use the drive-through during peak hours.

After each party submitted a proposed judgment and filed objections to the other party's proposed judgment, the court held a hearing on September 18, 2018, to address the proper form of judgment. Focusing on the differences between the two proposed judgments, in particular whether the judgment should void the Board's land use approvals in whole or in part, the court asked the parties "once the court concludes there's a fair argument, that there's substantial evidence of a fair argument, doesn't that mean the County has to do an EIR [environmental impact report]?" Applicants argued that under section 21168.9 and *Center for Biological Diversity v. Department of Fish & Wildlife* (2017) 17 Cal.App.5th 1245, 1255 (*Center for Biological Diversity*), courts have "broad latitude and flexibility in terms of how to fashion the appropriate relief to ensure compliance with CEQA." Applicants argued that the nature of the court's ruling on the traffic impact issues left open the possibility that the County could proceed with one of three options: a negative declaration, a mitigated negative declaration (MND), or an EIR. Acknowledging that the procedural error of failing to make the August 4, 2015 traffic study available to the public was a different question, the court pressed further, asking how a negative declaration would be possible

7

once the court had found substantial evidence of a fair argument on two specific issues—traffic signals and pedestrian safety. Applicants argued that a revised traffic study would analyze those two issues, comparing the court's ruling to a "fix-it ticket," that should direct the Applicants to fix the identified issues and nothing more, similar to the project proponents in *Center for Biological Diversity*. SORT argued that *Center for Biological Diversity* was distinguishable, because there the court had made severance findings under section 21168.9, while Applicants here had not requested severance findings.

On October 3, 2018, the trial court entered judgment in favor of SORT on its first cause of action (CEQA violation), and issued a writ of mandate which, after handwritten interlineation, directed the County to "do the following: [¶] 1. Set aside and vacate [the November 15, 2016 Board order for the 2014 CUP] that certified the Negative Declaration; shall set aside and vacate [the October 31, 2017 Board order for the Parcel Split] that relied upon the certified Negative Declaration; shall set aside and vacate any other pertinent approvals dependent upon the Negative Declaration; and, conduct further proceedings under CEQA in light of the Court's ruling dated July 27, 2018."

8

## DISCUSSION

### *CEQA overview*

"CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382.)

To implement these goals, CEQA requires state and local government agencies first to determine whether a proposed activity is a project subject to CEQA, and then to determine whether the project is exempt from CEQA or requires some form of a CEQA document, whether that be an EIR, a negative declaration, or an MND. (See generally *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1185–1187; *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944–945.) An EIR is "an informational document," the purpose of which "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is

likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061.) "A negative declaration is 'a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report.' (§ 21064.) An MND is 'a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment.' (§ 21064.5.)" (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 183–184 (*Clews*).)

***Applicants fail to raise any appellate issues***

Applicants' opening brief poses a conundrum for this court, because it does not make any recognizable assertion that the trial court committed any error requiring reversal. In fact, Applicants do not seek a reversal of the judgment; they only seek a clarification. According to Applicants, the

lower court's order (presumably its writ of mandate) does not expressly state what Applicants believe is required under CEQA. "Accordingly, once the minor additional traffic analysis is performed, the CEQA requirements will be fulfilled and the project can once again be circulated for public comment and considered at a hearing by the Los Angeles County Board of Supervisors. Because the Court order did not expressly state this fact, however, [Applicants] deem it prudent and necessary to clarify the order through this appeal."

It is uncontroverted that appellant bears the burden on appeal of showing prejudicial error. (Cal. Const., art. VI, § 13; *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107–1108.) The fundamental problem posed by Applicants' opening brief is summarized in the following excerpt from *Kelley v. Bailey* (1961) 189 Cal.App.2d 728, 731: "[W]hile counsel for the appellant is entitled to be heard upon every error which he deems it his duty to raise as ground for reversal, the appellate court cannot be expected to search the record or prosecute an independent inquiry for errors on which the appellant may be relying. It will notice only those errors pointed out in the brief, and all others may be deemed waived or abandoned. Hence an appellant who fails to present a point in his brief is precluded from insisting that the court consider the matter. *Not only must the appellant raise the point in his brief, but he must point out the error specifically, showing exactly wherein the lower court's action is deemed erroneous.*" (Italics added.) Here, Applicants do

11

not argue in their opening brief that the trial court's judgment was erroneous or requires reversal; they ask that we add language to the trial court's judgment, because it was not expressly stated by the trial court itself.

Having failed to point to any prejudicial error in the opening brief, Applicants argue in their reply brief that the trial court failed to sever the judgment as permitted under section 21168.9, subdivision (b). As far as we can decipher, Applicants argue that the trial court should have severed the negative declaration from the Board's orders approving the 2014 CUP and the Parcel Split. This argument fails for two independent reasons. First, any argument made for the first time in the reply brief is waived, absent a showing of good cause. (*Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 681 (*Agoura Knoll*) [issue forfeited when raised only in reply brief].) Applicants provide no reason, much less reasons constituting good cause, for their failure to raise the severance issue in the opening brief. Second, even if we were to consider the merits of Applicants' argument, they have not demonstrated that the trial court abused its discretion in declining to make express severance findings. "When a court voids an agency determination 'in part,' it must make severance findings pursuant to section 21168.9, subdivision (b), to determine whether the voided portions are severable, and whether the remainder will be in full compliance with CEQA." (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 17 Cal.App.5th at p. 1253.) Here, the project approval

12

could not be in full compliance with CEQA if a court severed from that project approval the negative declaration on which the project approval depends.  For a project approval to occur, there must be some valid CEQA document (i.e., a negative declaration, mitigated negative declaration, or EIR) attached to it at the time of approval.  The kind of severance sought here would lead to subsequent actions by the County with respect to traffic studies that are no more than a post-hoc rationalization for the severed, prior project approval.  That is impermissible under CEQA.  (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 127 [subsequent EIR preparation did not moot question of whether project approvals complied with CEQA]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376; *Center for Biological Diversity*, *supra*, at pp. 1256–1257 [valid severance findings supported order severing non-compliant project approvals from ones that would not prejudice full and complete compliance with CEQA if left in place].)

### *SORT's cross-appeal*

SORT's cross-appeal includes three contentions of error.  First, SORT contends that the trial court erred when it found no substantial evidence to support a fair argument on two areas where SORT argued the Project would have traffic impacts—traffic delays at the intersection of Crown Valley and Antelope Woods Road, and traffic delays on

Sierra Highway based on the number of cars anticipated to use the drive-through during peak hours. Second, SORT contends the trial court applied the wrong standard of review when it upheld the Board's determination that the Project was consistent with the Antelope Valley Area Plan. Third, SORT contends the trial court failed to consider its argument that the Board's approval of the 2014 CUP violated County zoning codes.

## A. Substantial evidence of a fair argument on vehicle traffic delays

When the trial court considered whether there was substantial evidence of a fair argument that the Project would have a significant impact on traffic, it found that a fair argument existed on two of SORT's claims: traffic signalization and pedestrian hazards. However, the trial court rejected three other traffic-related claims raised by SORT, finding no substantial evidence of a fair argument of significant impacts regarding: trip generation estimates; vehicle delays at a specific intersection; and vehicle delays and interference with street traffic caused by back-ups at the drive-through service at the restaurant.

In its cross-appeal, SORT contends that the trial court erred, and that the administrative record contains substantial evidence supporting a fair argument that the Project may have significant environmental impacts in two of the three areas rejected by the trial court. SORT does not

14

challenge on appeal the trial court's findings relating to trip generation estimates. Rather, its argument is centered around evidence of vehicle delays at the intersection of Crown Valley and Antelope Woods Road and at the driveway leading into the drive-through for the restaurant. Applicants' only response to this argument is that the trial court was not persuaded, and did not find substantial evidence to support SORT's claims. We agree with SORT that there is sufficient evidence in the record to support a fair argument that the Project may have a significant impact on the environment in the two areas SORT raises on appeal.

1. <u>Standard of review - substantial evidence of a fair argument</u>

"In reviewing an agency's . . . decision for compliance with CEQA, we ask whether the agency has prejudicially abused its discretion; such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' ([ ] § 21168.5.) In determining whether there has been an abuse of discretion, we review the agency's action, not the trial court's decision. '[I]n that sense appellate judicial review under CEQA is de novo.' [Citation.]" (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 214–215, fn. omitted.) We determine de novo whether the agency has employed the proper procedures, and we review the agency's substantive factual

conclusions for substantial evidence. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512; *Agoura Knoll, supra*, 46 Cal.App.5th at pp. 675–676.)

If a lead agency approves a project for which it has certified a negative declaration or a mitigated negative declaration, and the agency's decision is challenged for CEQA compliance, the reviewing court will find an abuse of discretion if there is substantial evidence to support a fair argument that the project may have a substantial environmental impact. (*Agoura Knoll, supra*, 46 Cal.App.5th at pp. 675–676, citing *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1112 (*Berkeley Hillside*).) The reasoning behind the "fair argument" standard is explained in *Berkeley Hillside*: "'[I]f a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect.'" (*Berkeley Hillside, supra*, 60 Cal.4th at pp. 1111–1112, quoting Guidelines, § 15064, subd. (f)(1); see also *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171 ["If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must . . . prepare an EIR."].) "[A] reviewing court may not uphold an agency's decision 'merely because substantial evidence was presented that the project would not have [a significant environmental] impact. The

16

[reviewing] court's function is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed "fair argument" could be made. If there [is] substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it [can] be "fairly argued" that the project might have a significant environmental impact. Stated another way, if the [reviewing] court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed "in a manner required by law."' [Citation.]" (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1112, quoting *Friends of B Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1002.) "The fair argument standard is a 'low threshold' test for requiring the preparation of an EIR. [Citations.] It is a question of law, not fact, whether a fair argument exists, and the courts owe no deference to the lead agency's determination. Review is de novo, *with a preference for resolving doubts in favor of environmental review*." (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.)[2]

---

[2] As we explain later in this opinion, SORT is not seeking on appeal an order *requiring* the Applicants to prepare an EIR.

17

2. Potential traffic impacts and the significance of impacts identified by the HCM methodology

   SORT's opening brief goes into great detail to explain why a particular table in the August 4, 2015 traffic study constitutes substantial evidence of significant delays in vehicle travel times. SORT also argues that the trial court's rationale for ignoring or discounting that evidence was invalid. Since we make our own determination on appeal whether the administrative record contains "substantial evidence of a fair argument" that the Project may cause a significant impact on the environment, we focus on the evidence before us, rather than the trial court's reasoning.

   The August 4, 2015 traffic study included an explanation of the two distinct methodologies used to determine whether the level of service for each of five intersections studied would be impacted by the Project. "The study intersections are under the jurisdiction [of] Los Angeles County or Caltrans. Each has different criteria and thresholds to identify the lowest desired service levels. Los Angeles County requires the use of the Intersection Capacity Utilization (ICU). Caltrans requires the use of the Highway Capacity Manual (HCM)." The results of either methodology is then translated into a Level of Service (LOS) between A and F, with A signifying an intersection with minimal delay, and F signifying an intersection with substantial delay. Los Angeles County and Caltrans each have standards to

determine when, under their respective methodology, the impact on an intersection is considered significant.

*a) HCM numbers provide fair argument of significant impact*

SORT argues that although the narrative portion of the August 4, 2015 traffic study stated that the level of service (LOS) results based on the HCM methodology were not applicable as to the intersection of Crown Valley and Antelope Woods Road, the tables provided as attachments to the traffic study show that the project would have a significant impact on the intersection, bringing it down to LOS "F." SORT argues that regardless of the narrative portion of the report, the table constitutes substantial evidence of a fair argument that the Project may have significant traffic impacts. The only response Applicants offer to SORT's argument is that "the trial court cites the August Study analysis and states it was not persuaded that the traffic studies showed a fair argument of significant impacts" at the intersection of Crown Valley and Antelope Woods Road. We are not, however, bound to give any deference to the trial court's reasoning.

We conclude that the table included in the traffic consultant's report showing the additional vehicle delays at the intersection of Crown Valley and Antelope Woods constituted substantial evidence of a fair argument that the Project would have a significant impact on traffic. The fact that a different methodology (the ICU methodology) showed

no significant impact is not relevant to our analysis; we are concerned here with whether there was substantial evidence that the County incorrectly found no fair argument that the Project may have a significant impact on traffic in the area. As explained earlier, we can uphold the County's decision not to require an EIR (or at least an MND) only if there is no credible evidence that the Project may have a significant impact on the environment. (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 720–721; *Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, 842.)

We also reject the argument that, because the intersection of Crown Valley and Antelope Woods Road was not a freeway on or off ramp, the evidence based on the HCM methodology was inadequate to demonstrate a significant impact requiring either mitigation efforts or further analysis in an EIR. As SORT points out in its cross-appeal, the County has applied HCM methodology to non-freeway, stop-controlled intersections, and directed the traffic consultant to use the HCM methodology for another project in Acton involving a Taco Bell restaurant with a drive-through. There is nothing implicitly improper with using HCM methodology to evaluate traffic impacts on a stop controlled intersection, and the traffic consultant applied the methodology in its own tables.

Our role here is not to dictate that a specific methodology must be applied in analyzing the traffic impacts of a proposed project, and we do not do so. Nor do we criticize the County for its apparent view that the ICU

20

methodology is the most reliable method to analyze the traffic impacts in this circumstance. But where an agency generates traffic studies using two different, standard methodologies, its later reliance on only one of the two methodologies to determine that a project will have no significant traffic impacts does not prevent project opponents from citing the other methodology as substantial evidence of a fair argument. Since our role is to determine if substantial evidence of a fair argument exists on the record, not to weigh the relative merits of the two methodologies, we conclude on this record that the County erred by ignoring the substantial evidence of traffic delays shown by the HCM methodology included in the August 2015 traffic study. (*Rominger v. County of Colusa, supra*, 229 Cal.App.4th at pp. 720–721.)

*b) Thresholds of significance*

SORT points out that the County has not adopted a threshold of significance for intersections, and Applicants do not argue otherwise. The absence of a county-adopted threshold of significance does not preclude us from finding that an intersection operating at an LOS "F," which here translates to a four minute delay, constitutes a significant impact on the environment. The CEQA Guidelines encourage public agencies to develop "thresholds of significance" to assist in determining whether a project's effect will be deemed significant. (Guidelines, § 15064.7.) "'A threshold of significance is an identifiable quantitative,

21

qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant.' [Citation.]" (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2016) 2 Cal.App.5th 1067, 1073.)

Even if the County had adopted a threshold of significance under the CEQA Guidelines, such a threshold "may not be applied 'in a way that forecloses the consideration of any other substantial evidence showing there may be a significant effect.' [Citation.]" (*Protect Niles v. City of Fremont* (2018) 25 Cal.App.5th 1129, 1153 [fair argument based on residents' fact-based comments, where thresholds did not account for community's specific circumstances].) For the reasons already stated, we agree that the evidence showing that the Project will cause the intersection of Crown Valley and Antelope Woods Road to operate at LOS "F," means the Project's effect on traffic is significant, and certainly sufficient to raise a fair argument on the question of vehicle delay.

3. <u>Evidence that vehicles using drive-through will cause a traffic impact</u>

SORT also challenges the trial court's determination that there was inadequate evidence to support a fair

22

argument that the Project would increase traffic on Sierra Highway during peak morning and evening hours. SORT points to evidence that the August 2015 traffic study showed 90 cars entering the restaurant driveway per hour between the hours of 7:00 a.m and 9:00 a.m., and the consultant applied a 20 percent drive-through use rate, meaning that 20 percent of all cars entering the driveway would use the drive-through. In other words, 18 cars per hour would use the drive-through during the morning peak hours. There was evidence that the parcel and design of the drive-through could accommodate 11 cars in the "ordering area." Using the Board's assumption that each drive-through customer would wait 10 to 12 minutes, SORT argues there is substantial evidence to support a fair argument that the line-up of cars waiting to use the drive-through in the morning peak hours would have a significant impact on traffic on Sierra Highway, because cars would back up into the road.

Applicants offer no response to SORT's argument based on the consultant's data and mathematical analysis as it was presented to the Board. Rather than address the question whether the administrative record contains substantial evidence of a fair argument that the Project would cause the alleged traffic impact, Applicants simply state "the trial court ruled that the record August Study showed there was sufficient capacity for the drive-through and that [SORT's] claim of a higher rate had not been presented as evidence." But our review of the administrative record is de novo, and we do not defer to the trial court's

interpretation of the evidence. Moreover, to the extent we might adopt the trial court's reasoning, here the trial court's finding of no substantial evidence was based on a mathematical error that halved the number of cars anticipated to use the drive-through during peak times, as SORT amply shows. Applicants offer no argument to the contrary.

Based on the evidence of the number of cars anticipated to use the drive-through at peak hours, the average waiting time, and the capacity of the drive-through area, we find substantial evidence to support a fair argument that the Project may have a significant impact on traffic on Sierra Highway.

4. Traffic impact issues are not moot

Applicants contend that because they are already preparing a new traffic study to examine traffic signals and pedestrian hazards in response to the trial court's findings, any additional issues with the adequacy of the previous traffic study are now moot. "An appeal is moot if the appellate court cannot grant practical, effective relief." (*Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340, 362–363 (*L Street*).) SORT's cross appeal is not moot, because the County has not yet filed a return on the trial court's writ of mandate, and if we agree with SORT's argument, the court's decision on whether to discharge the writ would be bound by our

24

analysis in this appeal. (*Ibid.*; see *Golden Gate Land Holdings LLC v. East Bay Regional Park Dist.* (2013) 215 Cal.App.4th 353, 367 [compliance with the remedy ordered in the writ does not moot an appeal that challenges the legality of that remedy].)

5. <u>Remedy</u>

Applicants argue that SORT's cross-appeal is an impermissible attempt to force the County to prepare an EIR, even though (according to Applicants), an EIR is not warranted or required. In its reply brief, SORT responds that whenever there is substantial evidence that a project may cause significant environmental impact, resulting in a court determination that project approvals based on a negative declaration are vacated, an EIR is required. (§ 21082.2, subd. (d); *Pocket Protectors*, *supra*, 124 Cal.App.4th at p. 935.) However, during oral argument, SORT clarified that it was not seeking an order that an EIR was required, and that in some circumstances, an MND could meet CEQA requirements. This is consistent with the more nuanced approach described by our colleagues in *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2017) 11 Cal.App.5th 596, 611. Even after concluding there was substantial evidence to support a fair argument that changes in a project may cause significant environmental impact, that court recognized the possibility that such an impact might be

25

"reduced to insignificance" by the agency, when taking up the project again, through the use of mitigation measures and reflected in a mitigated negative declaration. (*Ibid.*; see also *John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 102 [remedy for CEQA violations could include electing not to proceed with the project].)

On the evidence presented in the administrative record, we cannot conclude that an EIR will be required. It is possible, for example, that Applicants may agree to certain changes to the Project, such that the County could comply with CEQA by adopting a mitigated negative declaration. At this point, it is impossible to predict, and we will not speculate, whether a mitigated negative declaration would be sufficient to reduce any significant impacts on the environment revealed by the August 2015 traffic study, or any traffic studies conducted in the future. We therefore decline to direct the trial court to amend its writ of mandate to require preparation of an EIR.

## B. Consistency with area plan reviewed for substantial evidence

SORT contends the trial court applied the wrong standard of review when it found substantial evidence supporting the County's determination that the Project was consistent with community-specific land use concepts

26

described in the Antelope Valley Area Plan (the Area Plan).[3] SORT argues that because the Area Plan expressly states the residents' desire to preserve the rural character of the area, the court should have applied CEQA's "substantial evidence of a fair argument" standard. It then argues that an EIR was necessary because the record contains substantial evidence of a fair argument that the Project was not consistent with the Area Plan.

1. Relevant Facts

Chapter 7 of the Area Plan recognizes that specific communities within the Antelope Valley vary in nature, form, and character. That chapter sets out "Community-Specific Land Use Concepts" describing how the land use aspects of the area plan are to be implemented in each specific community. The section specific to Acton—which is the relevant community for this case—begins by describing

_____

[3] SORT refers to the Area Plan as the "Town and Country Plan." While the "Town and Country" phrase is used in the Area Plan, we decline to adopt that terminology. The following excerpt sheds light on the purpose of the Area Plan: "The purpose of the Antelope Valley Area Plan (Area Plan) is to achieve the communities' shared vision of the future through the development of specific goals, policies, land use and zoning maps, and other planning instruments. This shared vision is articulated in the Town and Country Vision Statement, which was developed by the Antelope Valley communities in various workshops in 2008."

the community's geographic placement and goes on to note that portions of the community are partially developed with a variety of agricultural uses, single homes on large lots, a rural town center, as well as some low-intensity commercial areas separate from the town center.  Other portions of the community "are largely undeveloped, are generally not served by existing infrastructure, contain environmental resources, such as Significant Ecological Areas and Hillside Management Areas, and are subject to safety constraints, such as Very High Hazard Severity Zones."  The description notes that "[c]ommunity residents are concerned about urbanization of the areas and wish to remain an unincorporated rural community with a unique identity."  The Project is located in one of Acton's low-intensity commercial areas, where new buildings are limited to two stories, using "Old West design elements with earth tone colors at a pedestrian-oriented scale."  Development "that would require the installation of urban infrastructure, such as concrete curbs and gutters, street lights and traffic signals, shall be discouraged as this does not fit with the community's unique rural character and identity."

The Planning Commission initially determined that allowing a drive-through restaurant was not consistent with the Area Plan, because the location of the property adjacent to Highway 14 would attract highway travelers and disrupt the rural character of the community.  The Board, however, found that the drive-through restaurant was intended to serve the local community, and would not draw substantial

additional traffic from the freeway.  The Board therefore found the Project to be consistent with the Area Plan.  The trial court found that the Board's findings were supported by substantial evidence.

2. Agency decisions about a project's consistency with an area plan are reviewed for substantial evidence

SORT argues the trial court should have applied the fair argument standard applicable to CEQA matters, rather than the more deferential substantial evidence standard of review applicable to land use decisions such as determining consistency with a general or area plan.  We reject SORT's argument.

In *Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 371–372 (*Georgetown*), the appellate court drew a contrast between reviewing a negative declaration for CEQA compliance, where a court would apply the fair argument standard, and reviewing an agency's planning or zoning decisions, where a more deferential substantial evidence standard applies:  "In contrast, planning or zoning determinations are reviewed with greater deference, both because the public entity is deemed best able to interpret its own rules and because it is presumed to bring local knowledge and experience to bear on such issues.  [Citations.]  'A . . . determination that a project is consistent with the . . . general plan "carries a strong presumption of regularity.  [Citation.]  This determination

29

can be overturned only if the [entity] abused its discretion—that is, did not proceed legally, or if the determination is not supported by findings, or if the findings are not supported by substantial evidence. [Citation.] . . . [A] determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, '. . . a reasonable person could not have reached the same conclusion.' [Citation.]" [Citation.]' [Citations.]" (*Ibid.*)

SORT argues that the trial court's reliance on *Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 695–696 (*Joshua Tree*), as the basis for applying the substantial evidence standard of review was unwarranted, and that *Joshua Tree* somehow misinterpreted *Pocket Protectors*, *supra*, 124 Cal.App.4th at pp. 929–932. In *Joshua Tree*, project opponents sought a writ of mandate challenging the county's approval of a large, new retail building for a Dollar Store. The project opponents asserted several claims, including one under CEQA and a separate claim that the project was inconsistent with a community plan that favored small independent businesses. (*Id.* at pp. 681–682.) Like SORT, the project opponents in *Joshua Tree* argued that when a project's alleged inconsistencies with local plans and policies constitute significant impacts under CEQA, the fair argument standard of review should apply. The appellate court rejected the argument and instead applied "the usual standard that applies to a claim of inconsistency with a land use plan." (*Id.* at p. 695.)

30

A leading CEQA treatise cautions against the argument that SORT is making: "The decision in *Pocket Protectors* should not be interpreted to hold that any claim of inconsistency with an applicable land use plan or policy requires an environmental impact report. In *Pocket Protectors*, several factors in combination were important in the court's holding that there was a fair argument of significant impact based on the land use consistency issues. These factors included (1) that the governing land use standards were adopted in part for the purpose of mitigating environmental impacts, and (2) that the project proposed an entirely different type of housing than was originally envisioned in the development of the land use standards." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (2d ed. 2015), § 6.56, p. 6-60.1.) The decision in *Pocket Protectors* pointed to numerous indicia that the land use standards served as a close surrogate for determining environmental impact, including that the standards' objectives included providing adequate natural light and pure air, minimizing vehicular congestion, enhancing aesthetic values, facilitating open green spaces, and stressing the importance of landscaping. (*Pocket Protectors*, *supra*, 124 Cal.App.4th at p. 930.)

In contrast to the reasoning in *Pocket Protectors*, SORT's argument is not that the asserted inconsistency with the Area Plan serves as a closely aligned measure of environmental impact. Rather, SORT argues that whenever an agency includes consistency with land use plans in its

31

CEQA initial study checklist, then the question of such consistency becomes a CEQA issue, warranting CEQA's stricter fair argument standard of review if the agency adopts a negative declaration. In both *Pocket Protectors* and *Georgetown*, the appellate court rejected the argument that members of the public were precluded from raising a fair argument that a project might have a significant impact on the environment just because an agency had already determined that the project was consistent with planning and zoning requirements. (*Georgetown, supra,* 30 Cal.App.5th at pp. 370–374; *Pocket Protectors, supra,* 124 Cal.App.4th at pp. 929–935.) SORT's argument is a misguided attempt to turn these holdings on their heads, by arguing that whenever an agency checks for consistency with land use plans as part of its CEQA initial study checklist, then the fair argument standard applies to the agency's land use decision as well. Having demonstrated why this is not a sound reading of the current case law, we conclude that the trial court correctly applied the substantial evidence standard of review to the causes of action challenging the Project's consistency with the Community-Specific Land Use Concepts for Acton, as described in Chapter 7 of the Area Plan. SORT does not contend that the record lacks substantial evidence to support the Board's findings, so our analysis of the land use question ends here.

## C. The Board's Project approvals were in compliance with zoning requirements

SORT's last contention on appeal is that the Project violates County zoning requirements, because the -DP zoning designation prevented the County from approving a project that was substantially different from the project previously approved in 2007. We reject this argument, in part because the argument is inadequately presented in the appellate briefing, and also because we find it unconvincing in light of the broad discretion cities and counties possess when granting conditional use permits.

### 1. Relevant Facts

In 2007, the County granted a conditional use permit (2007 CUP) and re-zoned the Project site from A-1 (Light Agricultural) to C-3-DP (Unlimited Commercial - Development Program), based on the Gaudis'[4] application to build a retail feed store. The store was not constructed, and the 2007 CUP expired.

While the 2014 CUP application was pending before the Planning Commission, the Board adopted the Area Plan in June 2015. Under the Area Plan, the land use zoning category of the Project site changed from C-3-DP to C-RU-

---

[4] As owners of the real property parcel, the Gaudis are one of the Applicants and real parties in interest.

DP (Rural Commercial - Development Program). The Area Plan gave the following description of the C-RU zone designation: "Limited, low-intensity commercial uses that are compatible with rural and agricultural activities, including retail, restaurants, and personal and professional offices."

When the Planning Commission and the Board were evaluating the 2014 CUP and the 2016 Map applications, there was public input that the drive-through element did not conform with plans and exhibits underlying the 2007 CUP and rezoning decisions that approved the C-3-DP zoning. Despite the Planning Commission's decision to withhold approval of a drive-through for the restaurant, the Board approved the 2014 CUP with the drive-through. In its findings, the Board noted that the CUP was required because the Project was in a -DP overlay zone, and LACC 22.40.040 "allows any use permitted in the basic zone (C-RU) if a CUP has been obtained." The Board further noted that under LACC section 22.28.390, "a CUP is also required for drive-through services in the C-RU Zone." It also reviewed the site's zoning history, which went from agricultural in 1958 to C-3-DP in 2007 to C-R-DP in 2015 with the adoption of the Area Plan.

2. SORT's argument

Nowhere in its briefing does SORT identify the standard of review that this court should apply to its

34

argument that the Board violated Los Angeles County Code (LACC) section 22.040.030 when it approved the 2014 CUP. SORT also fails to provide any citations to the record demonstrating how the issue was raised with the trial court, or any legal citations to support its argument. Even if we overlook these deficiencies in SORT's argument, we are not persuaded that the Board abused its discretion or lacked substantial evidence to support its decision to approve the 2014 CUP.

SORT starts its argument by criticizing the trial court for rejecting its argument on immaterial grounds. According to SORT, the trial court relied on a 2007 finding[5] by the Planning Commission that did not pertain to the question of whether the project proposed for the 2014 CUP substantially differed from the 2007 CUP.

SORT goes on to argue that because the -DP zone change in 2007 was based on Planning Commission findings that included a site plan showing a single commercial building with detached storage and retail/office space, but no restaurant, and LACC 22.040.030 requires development after rezoning to conform to plans and exhibits that constitute a critical factor to rezone, the 2014 CUP violated LACC 22.040.030. SORT's argument concludes as follows:

---

[5] The finding (finding #6) stated that the C-3-DP designation was needed "to promote use of the property that is compatible with the surrounding existing zoning and uses, including the adjacent commercial developments to the north, east, and west of the subject property."

35

"The trial court did not address SORT's argument that the Project does not comply with the -DP overlay zone change or LACC 22.040.030; nor did the trial court consider any of the record evidence showing that the Project approved by the Board differed substantially from the 'plans and exhibits' that constituted a critical factor in the 2007 decision to rezone the property to -DP.  Had the trial court evaluated this [*sic*] facts it should have found that the Project did in fact violate LACC 22.040.030."

3. <u>Standard of review</u>

The issuance of a conditional use permit is a quasi-judicial administrative act that is reviewable under the administrative mandamus procedures pursuant to Code of Civil Procedure section 1094.5.  (*Essick v. Los Angeles* (1950) 34 Cal.2d 614, 623; *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1005 (*Neighbors*).)  "Except in a limited class of cases involving fundamental vested rights [citation], the trial court reviews the whole administrative record to determine whether the agency's findings are supported by substantial evidence and whether the agency committed any errors of law." (*Neighbors,* at p. 1005.)  The standard of review on appeal is the same as that applied by the trial court.  (*Ibid.*)  That is, before upholding a CUP decision, the reviewing court must "scrutinize the record and determine whether substantial evidence supports the administrative agency's

findings and whether these findings support the agency's decision." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.) "In determining whether the findings are supported, '[w]e may not isolate only the evidence which supports the administrative finding and disregard other relevant evidence in the record. [Citations.] On the other hand, neither we nor the trial court may disregard or overturn the . . . finding "'for the reason that it is considered that a contrary finding would have been equally or more reasonable.'" [Citations.]' [Citation.] [¶] In determining whether the decision is supported, we require the findings to 'bridge the analytic gap between the raw evidence and ultimate decision or order.' [Citation.] The findings need not be stated with the precision required in judicial proceedings. [Citation.] They may properly incorporate matters by reference and even omissions may sometimes be filled by such relevant references as are available in the record. [Citation.] 'Thus, where reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency "in truth found those facts which as a matter of law are essential to sustain its . . . [decision]." [Citations.]' [Citation.] [¶] 'In making these determinations, the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision.' [Citation.]" (*Craik v. County of Santa Cruz* (2000) 81 Cal.App.4th 880,

884–885.)  The decision whether to issue a conditional use permit is "discretionary by definition." (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1224.)

4. Analysis

SORT has not shown that the Board's decision to approve the 2014 CUP was an abuse of discretion or was based on legal error.  The Board's findings demonstrate that it was aware of the 2007 zone change to allow a commercial building with a conditional use permit.  It is uncontroverted that the 2007 CUP expired before the property's zoning designation changed to C-RU-DP as part of the 2015 adoption of the Area Plan.  Resolving reasonable doubts in favor of the administrative findings and decision, the Board's decision can reasonably be construed as deciding that the particulars of the 2007 CUP were irrelevant to the decision it made in 2017 on the 2014 CUP application, particularly in light of the intervening re-zoning.  On the facts before us, we find no violation of LACC section 22.040.030.

# DISPOSITION

The case is remanded to the trial court with instructions to amend the judgment entered in favor of petitioner Save Our Rural Town (SORT) on SORT's first cause of action for administrative mandate to specify that a writ of mandate shall issue directing the County of Los Angeles to comply with CEQA for all issues where there is substantial evidence to support a fair argument that the Project proposed by real parties in interest Douglas and Joanna Gaudi, Paul Zerounian, and Robert Friedman, might have a significant environmental impact.  Except as to the question of whether there is substantial evidence of a fair argument regarding traffic delays, as discussed in this opinion, the judgment is affirmed.  Real parties in interest Douglas and Joanna Gaudi, Paul Zerounian, and Robert Friedman and the County of Los Angeles are ordered to pay costs on appeal to SORT.


MOOR, J.

We concur:


RUBIN, P. J.          KIM, J.